EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:13-cv-23285-WJZ
State Case No.: 13-25116CA-10

AUTOMOTORES GALINDO, S.A.,

      Plaintiff,

v.

FORD MOTOR COMPANY,

      Defendant.

_____/

## DECLARATION OF RAMIRO GUEVARA IN SUPPORT OF DEFENDANT'S OBJECTIONS TO RECOGNITION AND ENFORCEABILITY OF AN OUT-OF-COUNTRY FOREIGN JUDGMENT

      I, RAMIRO GUEVARA, declare under penalties of perjury as follows:

1. I am an attorney duly admitted to practice before the courts of the Republic of Bolivia.  I am the senior partner at the law firm of Guevara & Gutierrez S.C. ("Guevara law firm") with offices at Calle 15 No. 7715, esquina Calle Sanchez Bustamante, Torre Ketal, Piso 4, Of. 2, La Paz, Bolivia, as well as at B/Sirari – Calle Los Gomeros No. 120, Santa Cruz, Bolivia.  The Guevara law firm also maintains correspondent offices in the cities of Cochabamba and Sucre, Bolivia.

2. Guevara law firm has been and continues to be counsel to Ford Motor Company ("Ford") in the Bolivian proceeding which led to the issuance of the judgment whose recognition and enforcement is being sought in the instant action.  As the senior partner, I have at all relevant times maintained full oversight of the Guevara law firm's representation of Ford in the Bolivian proceedings.

3.  I submit this declaration at the request of U.S. counsel for Ford in the instant action. Specifically, I have been asked and hereby do set forth below the legal process in Bolivia which led to the issuance of the Bolivian judgment.

4.  On August 2, 2002, Enrique Galindo Huerta, in his capacity as the legal representative of Automotores Galindo S.A. ("Galindo S.A."), filed a civil lawsuit in the City of Cochabamba, Republic of Bolivia, against Ford ("Bolivian Court Action"). A copy of the claim is annexed hereto as *Exhibit A*.

5.  Some background about the Galindo family. Although the legal representative of Galindo S.A. in the Bolivian Court Action was Enrique Galindo Huerta, Galindo S.A. is a family enterprise in which the patriarch, Hugo Galindo Salcedo, is the most prominent member (and, indeed, remains the primary legal representative of the company).

6.  Cochabamba, where the events described herein took place, was at the time of the commencement of the Bolivian Court Action the fourth largest city in Bolivia with a population of approximately 500,000, substantially lower than the population of the two largest cities. Bolivia is divided into Departments. Prior to 2010, the political head of each Department held the title of the Prefect and, prior to 2005, was appointed by the President of the Republic. Mr. Hugo Galindo was the Prefect of the Cochabamba Department from 1999 until 2000. He was appointed to this position by virtue of being a very prominent member of one of the most important political parties in Bolivia at the time (Acción Democrática Nacionalista), which was headed by the former military dictator, General Hugo Banzer Suárez. In addition, as a result of his various enterprises (which extended well beyond the Ford dealership), Mr. Hugo Galindo was regarded as a very prominent and influential member of the Cochabamba business community, having been elected President of the Cochabamba Chamber of Commerce on several occasions.

7.  By way of further context, the Bolivian Court Action was commenced several months after a judgment was obtained by Ford Credit Europe (a trade name of FCE Bank plc and an indirectly-owned subsidiary of Ford Motor Company) against Galindo, S.A. in the High Court of Justice of England, in the amount of

$2,229,431.86.  The English Court judgment was issued on January 29, 2002, six months before Galindo S.A. filed the Bolivian Court Action. In April 2004, the English Court judgment was recognized and admitted by the Bolivian Supreme Court as a result of an *exequatur* procedure.

8.  Galindo S.A.'s claims in the Bolivian Court Action were predicated on the Global Importer Dealer Sales and Service Agreement, dated April 15, 1999, between Galindo S.A. and Ford ("GIDS Agreement"), and the Global Importer Dealer Sales and Service Agreement Standard Provisions ("GIDS Standard Provisions"), which were incorporated and made a part of the GIDS Agreement.  A copy of the GIDS Agreement is annexed hereto as *Exhibit B*.  A copy of the GIDS Standard Provisions is annexed hereto as *Exhibit C*.

9.  The gist of Galindo S.A.'s claims in the Bolivian Court Action was that Ford had fraudulently induced Galindo S.A. to enter into the GIDS Agreement by means of (a) misrepresentations of Galindo S.A.'s risks and obligations under the GIDS Agreement, and (b) failure to timely execute the GIDS Agreement.  Galindo S.A. claimed that these "misrepresentations" and the alleged delay rendered impossible Galindo S.A.'s performance under the GIDS Agreement and ultimately led to the termination by Ford of Galindo S.A.'s dealership, which, according to Galindo S.A.'s filing, occurred on February 1, 2002.

10. Specifically as to its claims, Galindo S.A. asserted the following:

> *III. - CLAIM. - For the reasons described; and supported by the above-mentioned legal provisions as well as Article 327, and subsequent articles of the Code of Civil Procedure, we file an ordinary proceeding against the North American company FORD MOTOR COMPANY, for compensation of damages, requesting that after the compulsory procedures have been complied with, the claim be declared proven by final sentence and it be granted:*
> *a) A compensation for damages to GALINDO S.A. stemming from the pre-contractual fault and failure to communicate the grounds for termination of the concession contract signed in 1999, which led to investments in unproductive assets.*

> *b) Compensation for damages caused by the breach of the signing of the contract in a timely manner, which also led to unjustified investments.*
>
> *c) That the amounts be quantified on the execution of the sentence once it becomes res judicata.*
>
> *d) The condemnation to the payment of court fees.*

11. In accordance with Bolivian procedural law, Galindo S.A.'s claim was assigned to the Seventh Judge of Civil and Commercial Claims of the Judicial District of Cochabamba ("Seventh Civil Judge").

12. Subsequent to the filing of Galindo S.A.'s claim, Ford appointed, by means of a power of attorney, Bolivian lawyers Primitivo Gutiérrez Sánchez and Rodrigo Rivera Aldazosa of the Guevara law firm, as well as Sandra Yañez Eid (who was at the time a correspondent of the Guevara law firm in the city of Cochabamba), as Ford's attorneys in the Bolivian Court Action.  The power of attorney was legalized by the General Bolivian Consulate in Washington D.C., by the Bolivian Ministry of Foreign Affairs in La Paz, Bolivia, and was subsequently registered before a Bolivian Notary Public and the Bolivian Registry of Commerce.

13. On November 24, 2003, Sandra Yañez Eid, a correspondent of the Guevara law firm in Cochabamba, filed on Ford's behalf an objection to the Seventh Civil Judge's lack of subject matter jurisdiction.  The objection (hereinafter, the "Arbitration Objection") was based on the exclusive arbitration provision contained in the GIDS Agreement.  A copy of the Arbitration Objection is annexed hereto as *Exhibit D.*

14. Specifically, paragraph 14 of the GIDS Standard Provisions, entitled "DISPUTE RESOLUTION PROCESS," provides for arbitration as the exclusive method by which all disputes between Galindo S.A. and Ford were to be resolved. (Notably, the GIDS Standard Provisions were attached to Galindo S.A.'s claim, and served as the basis for Galindo S.A.'s claim.)

15. Paragraph 14 of the GIDS Standard Provisions sets out a very detailed arbitration procedure, which requires all disputes to be submitted to the American Arbitration Association in accordance with the Procedures for Cases under the UNCITRAL

Arbitration Rules, and further provides that the resolution of all such disputes is to be governed by the substantive and procedural law of the State of Michigan. Paragraph 14 concludes as follows:

> *The Company [i.e., Ford] and the Dealer [i.e., Galindo, S.A.] agree that the dispute resolution process outlined in this paragraph 14, which includes binding arbitration, **shall be the exclusive mechanism for resolving any controversy or claim between them arising out of or relating in any way to this Agreement including all attachments hereto, its creation, interpretation, implementation, invalidity or termination.***

> *Exhibit C* at 14 (emphasis added).

16. Ford's Arbitration Objection was supported by article 12 III of the Bolivian Conciliation and Arbitration Law No. 1770, which provides as follows:

> *Once the existence of an arbitration agreement is verified, and without possibility of filing any appeal, the judicial authority shall grant the arbitration objection, or, deciding only on the nullity or impossible execution of the arbitral agreement, the judicial authority shall reject the arbitration objection.*

17. On March 29, 2004, the Seventh Civil Judge issued a ruling dismissing the Arbitration Objection (the "Arbitration Objection Ruling"). A copy of the Arbitration Objection Ruling is annexed hereto as *Exhibit E.*

18. In the Arbitration Objection Ruling, the court ruled that:

> *(...) The Company Ford Motor Company, has unilaterally terminated the validity of the contract; now then, on the damages claimed by the dealer who says they were caused by this fact (of the unilateral termination of the contract), it is impossible to bring this claim to arbitration under the agreement before an Arbitral Tribunal of the State of Michigan United States: impossible situation that is provided by article 12-III last part of the cited law. THEREFORE.- The Arbitration Objection is dismissed.*

19. Effectively, the Seventh Civil Judge held that because Ford had terminated the GIDS Agreement, the arbitration clause in the agreement was thus also terminated and was therefore unenforceable.

20. On April 12, 2004, the Guevara law firm filed on Ford's behalf an appeal from the Arbitration Objection Ruling. A copy of the appeal is annexed hereto as *Exhibit F*. The appeal was based on Article 11 of the Bolivian Arbitration Law, which provides as follows:

> *Any arbitral agreement included in the main contract shall be considered as an independent agreement from the other provisions contained therein.*

Ford's argument, thus, was that the termination by Ford of the GIDS Agreement did not terminate the arbitration clause, which was deemed, under Article 11 of the Bolivian Arbitration Law, to be a separate and independent agreement enforceable on its terms.

21. Two years later, on May 26, 2006, the Second Court of Civil Claims of the Judicial District of Cochabamba ("Appeals Court") ruled (a) that it had no jurisdiction over the appeal, (b) that the ruling remitting the appeal to the Appeals Court was null and void, and (c) that Arbitration Objection Ruling was *res judicata*. As stated by the Appeals Court:

> *Article 12. III of Law No. 1770, clearly states that: '… once the existence of an arbitration agreement is verified, and **without possibility of filing any appeal**, the judicial authority shall grant the arbitration objection, or, deciding only on the nullity or impossible execution of the arbitral agreement, the judicial authority shall reject the arbitration objection…'; in this case having had the arbitration objection rejected, the Company Ford Motor Company filed an appeal, an appeal that was improperly granted by the a-quo [first instance] judge in blatant disregard of the transcribed legal rule which is of compulsory compliance pursuant to article 90 of the Code of Civil Procedure.*

(Emphasis in the original).  A copy of the Appeals Court's ruling is annexed hereto as *Exhibit G*.

22. The gist of the Appeals Court's ruling was that the Arbitration Objection Ruling was not appealable.

23. On December 9, 2006, Primitivo Gutiérrez Sánchez, of the Guevara law firm, filed on Ford's behalf a constitutional appeal ("Recurso de Amparo Constitucional") of the decisions of the Seventh Civil Judge and the Appeals Court (the "Constitutional Appeal").  The Constitutional Appeal requested the following relief:

> *i) that the declaration of res judicata of the ruling on the arbitration objection issued on March 29th, 2004, contained in the final part of the appeal ruling of page 194 issued on May 26th, 2006, be declared without any legal value or be declared inapplicable; and, ii) that the AD-QUO [first instance] judge must comply with paragraph III of Article 12 of the Conciliation and Arbitration Law No. 1770, declaring that the arbitration objection filed by the corporation Ford Motor Company be declared proven, with the consequent remittance of the case-file to the Arbitral Tribunal agreed by the parties, with condemnation to the payment of court fees.*

A copy of the Constitutional Appeal is annexed hereto as *Exhibit H*.

24. On February 2, 2007, the Third Court of Criminal Claims of the Judicial District of Cochabamba (the "Constitutional Appeals Court"), without reviewing the merits of the appeal, issued a ruling declaring the Constitutional Appeal inadmissible.  The grounds for the ruling, as stated by the Constitutional Appeals Court, were as follows:

> *I. All persons contemplated in article 5 of the Commercial Code have the obligation to prove before the judicial authority their registration with the Registry of Commerce, as established by article 33 of the same body of law (…) Even though it is true that the document attached at pages 17 to 25 complies with the requisites of validity required by article 1309 of the Civil Code, because*

*it is a photocopy of the original document, legalized by the official who is the legal depository of said document, Tatiana Terán de Velasco, Public Notary No. 61 of the city of La Paz; however, it does not prove the registration of FORD MOTOR COMPANY in the Registry of Commerce, nor the registration of the appointment of its legal representative, given that, even though the legalized copy shows the seal of the Registry of Commerce, said seal lacks legal value because it is not legalized by the officer in charge of the Registry of Commerce.*

*Even though it is true that the company FORD MOTOR COMPANY has its main office in the United States of America; however, such situation does not excuse its legal representative from complying with the above cited legal provisions, in order to act in judicial proceedings with the required legal representation. In any event, the appellant has not proven that the public document, which it affirms was granted abroad, complies with the formalities set forth therein, as required by article 1294 of the Civil Code.*

*In accordance with the above, due to the lack of the noted legal formality, the copy of the power of attorney No. 493/2003, of November 11th, 2003, granted by the Notary Public No. 61 of the city of la Paz, Tatiana Terán de Velasco, is insufficient to prove the legal representation of FORD MOTOR COMPANY by Primitivo Gutiérrez Sánchez.*

*In addition, in relation to the legal representation of the appellant, the copy of the power of attorney attached grants him powers to intervene 'in defense of the Company within the civil claim filed by AUTOMOTORES GALINDO S.A., claim currently heard before the Seventh Civil Judge of the District of Cochabamba of the Republic of Bolivia…' but does not grant the express power of attorney to act in the current Constitutional Appeal and to direct its claim against the Seventh Civil Judge or the members of the Second Court of Civil Claims of the Judicial Court of Cochabamba.*

*(…)*

*II. The copy of the power of attorney used by the appellant to act in this appeal, likewise does not comply with the provision of article 402 of the Code of Civil*

*Procedure, since it has not been presented in its entirety in the Spanish language, still contains parts in a foreign language that are not translated. Such situation invalidates the procedural value as proof of said document, and reinforces the conclusion that the appellant has not proven correctly its legal representation.*

*III. (…)*

*In this case the appellant does not describe precisely the remedy that it is requesting, since in its petition it does not request that the ruling issued by the Seventh Civil Judge on March 29, 2004 be declared without any effect; however it requests that said Judge grant the arbitration objection that he filed in representation of Ford Motor Company; which means that, being that the first ruling remains in force, we have to accept that another parallel ruling is issued in contrary sense; situation incongruent and contrary to any system of law. For that reason, it is established that the appellant did not comply with the rule of article 97, paragraph VI of the Constitutional Tribunal Law (…)*

A copy of the Constitutional Appeals Court's ruling is annexed hereto *as Exhibit I.*

25. In accordance with articles 7, par. 8) and 102 V of the Constitutional Tribunal Law No. 1836, the February 2, 2007, ruling of the Constitutional Appeals Court was forwarded for review to the Bolivian Constitutional Tribunal. On July 12, 2010, the Constitutional Tribunal confirmed the decision of the Constitutional Appeals Court on the grounds that:

*(…) from the review of the Power Of Attorney attached by the appellant (…) (pages 17 to 25 and its original from pages 93 to 101) it is evident that, although Ford Motor Company grants him with powers to intervene in defense of the Company within the civil claim that has motivated the constitutional appeal (…), being therefore able to that effect to file ordinary and extraordinary appeals, including the constitutional appeals set forth in the Constitutional Tribunal Law (sic); such instrument does not contain minimally the transcript of the documents related to the constitution of the company, the proof of its legal existence, documents related to the legal constitution of its board, the list of the*

*members of the board, election of its legal representative, internal rules that authorize to designate legal representatives, etc; on the contrary, it is established that the powers were granted by an Assistant Secretary and that another Secretary, also assistant, certifies that the first is precisely Assistant Secretary and that her powers were in turn delegated by the President of the Board, reason why such power of attorney cannot be considered as sufficient, and therefore it did not comply with a formal requisite, as a result of which the Constitutional Appeal Court should have rejected the constitutional appeal, but, since it was admitted and the ruling that is being reviewed was issued, it is necessary to reject the remedy sought without considering the merits of the case.*

26. In addition, the Constitutional Tribunal confirmed the reasoning of the Appeals Court's ruling concerning the interpretation of Article 12 III of the Arbitration Law, to the effect that the ruling issued by the Seventh Civil Judge was legally not subject to any appeal.

27. Based on this conclusion, the Constitutional Tribunal found that the six-month statute of limitations applicable to the filing of the Constitutional Appeal had expired before its filing. According to the Constitutional Tribunal, this was because the Constitutional Appeal was filed more than six months after the issuance of the Arbitration Objection Ruling by the Seventh Civil Judge. In this regard, the Constitutional Tribunal stated that:

*As a consequence, without need of further argumentation, being that the unsuitability of the appeal and consequently of the ruling of May 26th, 2006 was demonstrated and accepted; the date of service of said ruling cannot be considered as the beginning of the countdown of the six months period, but rather the service of the ruling of March 29, 2004 that was performed on April of that year (...) This fact ratifies the rejection of the remedy sought, clarifying that the merits of the case have not been analyzed.*

A copy of the ruling by the Constitutional Tribunal is annexed hereto as *Exhibit J.*

28. In simpler terms, the Constitutional Tribunal  ruled that because the Arbitration Objection Ruling issued by the Seventh Civil Judge was not appealable to the Appeals Court  (*i.e.*, through the regular appeals process), the six-month period for filing the Constitutional Appeal began to run not from the ruling of the Appeals Court (May 26, 2006), but from the Arbitration Objection Ruling issued by the Seventh Civil Judge (March 29, 2004).  Consequently, because the Appeals Court took more than two years to issue its ruling, the Constitutional Tribunal deemed the Constitutional Appeal as having been filed past the six-month deadline.

29. With the ruling of the Constitutional Tribunal, Ford had exhausted all of its legal avenues to enforce the arbitration provision of the GIDS Agreement in Bolivian courts.  Having so exhausted its avenues to enforce the arbitration provision, Ford chose not to submit any opposition to the substantive arguments made by Galindo S.A. in the Bolivian Court Action.

I declare under penalties of perjury that the above is true and correct to the best of my knowledge and information.

Executed this __12__ day of September, 2013, in La Paz, Bolivia.

RAMIRO GUEVARA

# EXHIBIT A



D.S. 21124 de 15-11-85,
R.M. Nº 1039 de 13-11-2001
Bs 1.50

Nº 2526088
Serie "A-2002"

SEÑOR JUEZ DE PARTIDO DE TURNO EN LO CIVIL.-

Proceso de Conocimiento

ENRIQUE GALINDO HUERTA, con CI-972871 Cbba, domiciliado en la calle Libertador Bolívar No. 1416, en su condición de representante legal de la sociedad anónima GALINDO SA - según poder 0044/2002, mayor de edad, hábil por derecho, a usted respetuoso expongo y pido:

I.- ANTECEDENTES.-

1.1.- CONCESION REGIONAL

GALINDO Y CIA Sociedad en Comandita por Acciones, DESDE EL AÑO 1943 mantuvo un convenio de ventas con FORD MOTOR COMPANY para realizar la comercialización de vehículos, repuestos y adicionalmente otorgar asistencia técnica a los clientes de la marca que adquirían los vehículos.

En el desarrollo de las actividades en fechas pasadas las relaciones se mantuvieron en forma consistente y sin mayores inconvenientes dado el cumplimiento en la Compañía Ford. El convenio de ventas el año 1992 luego de una negociación entre las partes de manera progresiva se convirtió en un contrato de concesión, hasta que el año 1993 en 5 de enero, se suscribió un nuevo documento en el que GALINDO SA (la sociedad en comandita se convirtió en sociedad anónima ) y Ford Motor Company convenían que la primera sería concesionaria en Bolivia en el Departamento de Cochabamba. Por un plazo indefinido.

El año 1994 como resultado de un estudio efectuado por FORD MOTOR COMPANY se asignó a GALINDO SA en forma adicional los departamentos de La Paz, Oruro, Potosí, Chuquisaca y Tarija,) y otorgó a favor de otro concesionario los Departamentos de Santa Cruz, Beni y Pando. (Se instruyó a Galindo SA que todas sus instalaciones sean equipadas, que cuente con repuestos y otros, que sin duda, determinaban se ejecuten inversiones no previstas en el contrato regional y menos intos nuevos acuerdos cursados por correspondencia, empero, los trabajos en los departamentos adicionales no se llevaron a cabo, pues, no existía contrato y menos exclusividad, lo que ponía en riesgo la ecuación económica financiera de la inversión que podría efectuar GALINDO SA )

1.2.- CONCESION NACIONAL

www.scantopdf.eu

En el año 1995, previo acuerdo no escrito se designó a GALINDO SA como concesionario exclusivo para BOLIVIA, dejándose de lado de manera práctica el acuerdo del año 1993 que era sólo para el Departamento de Cochabamba. En el año 1995, y estando GALINDO ya establecido como concesionario exclusivo, FORD MOTOR COMPANY en el mes de octubre curió una carta de intenciones, en la que se pedía a GALINDO SA ejecute inversiones en instalaciones, equipamiento, capacitación de personal, cuente con un capital de $us. 4.300.000 y se desarrollen algunas acciones en fechas topes. A cambio se ofertaba, asegurar la franquicia Ford y suscribir un contrato que se encontraba desarrollando.

Esa carta de intenciones fue firmada por el representante legal y enviada a FORD MOTOR COMPANY. A partir de ese momento, cumplimos a cabalidad lo establecido en la carta de intenciones y FORD efectuó varias exigencias para los centros de servicios en la ciudad de Cochabamba y La Paz, como pavimentar áreas, instalación de señalización, construcción de nuevos depósitos con dimensiones mínimas, construcción del centro de entrenamiento y otros que significaron erogaciones e inversiones considerables para GALINDO SA.

En la ciudad de Santa Cruz se materializaron fuertes inversiones inicialmente en local arrendado y posteriormente en la construcción de un edificio propio, cuyas especificaciones, características e incluso planos fueron determinado por FORD MOTOR COMPANY.

Adicionalmente, se adquirieron el stock de repuestos, equipos y capacitó al personal de las distintas áreas.

En la condición de concesionarios exclusivos y en una vinculación no escrita, FORD MOTOR COMPANY efectuó otras exigencias, concretamente que GALINDO se someta a los programas FORD 2000 y de Gerencia de Procesos para ograr certificaciones. Programas que tenían 5 niveles y buscaban mejorar las ventas y servicios de los concesionarios, empero, involucraban para su decuación nuevas inversiones para GALINDO SA. Nuestra empresa dio umplimiento a las exigencias hasta el nivel III recibiendo incluso ilicitaciones y premios por su pleno cumplimiento, empero, cuando decía ecutarse el nivel IV, los programas se interrumpieron por definición

D.S. 21124 de 15-11-85
R.M. N° 1039 de 13-11-2001
Bs 1.50

N° 2526089
Serie "A-2002"



1. unilateral de la empresa Americana, habiendo sido inútiles los esfuerzos e

2. inversiones ejecutadas por GALINDO SA.

3. Todas esas inversiones, exigidas, instruidas y aprobadas por FORD afectaron

4. seriamente al capital de operaciones de GALINDO SA, al extremo, que en el

5. período contractual, no pudo cumplir con las obligaciones con un

6. financiador europeo vinculado con la FORD.

1.3.- CONCESION CONTRACTUAL.-

7. El 15 de abril de 1999, se suscribió entre GALINDO SA y FORD MOTOR COMPANY

8. contrato de concesión para BOLIVIA, estableciéndose las condiciones en las

9. que se desarrollaría la concesión, sin embargo, no se hizo ningún tipo de

10. referencia o adoptó definiciones respecto de las inversiones efectuadas por

11. GALINDO SA en el período previo a la firma del contrato (cuatro

12. años).Contrato que fue incumplido por FORD en forma paulatina, pues, no

13. envió repuestos en forma oportuna, no entregaba los vehículos pedidos e

14. incluso llegó al extremo de instruir a otros concesionarios de Latinoamérica

15. que no vendan productos a GALINDO SA por el incumplimiento con el

16. financiador europeo, para finalmente, luego de tres años de vigencia del

17. contrato darlo por terminado en 1 de febrero del 2002, con lo que se condenó

18. a GALINDO SA de manera práctica que la totalidad de las inversiones

19. efectuadas en el período 95 al 99, antes de la firma del contrato no las pueda

20. recuperar y sean inversiones innecesarias, situación que no se habrían

21. producido si no concurrían las exigencias de FORD MOTOR COMPANY.

II.- FUNDAMENTOS DE DERECHO.-

2.1.- LEY APLICABLE.-

El artículo 787 del Código de Comercio establece que en materia comercial, la

voluntad puede expresarse verbalmente o por escrito, tal disposición y el

vínculo establecido entre GALINDO SA y FORD MOTOR COMPANY en el período

comprendido entre 1995 y abril de 1999, evidencia que concurrió una

relación jurídica previa al contrato de concesión de 1999, por la cual,

GALINDO SA era el único autorizado para adquirir vehículos y repuestos

marca FORD para su reventa en todo el territorio de BOLIVIA y, a su vez,

otorgar servicios de asistencia mecánica y conceder la garantía del

fabricante. Esa relación jurídica, que al tenor de los artículos 816 y 804 debe

www.scantopdf.eu

regirse por la Ley Boliviana y difiere de la establecida en el año 1999 por ser previa, no es susceptible de ser "encasillada" en un contrato típico comercial que corresponda a nuestra legislación.

## 2.2.- ANALOGÍA Y SUPLETORIEDAD

La analogía en derecho no es otra cosa que "regular mediante un caso previsto en la ley, otro que siendo semejante se ha omitido considerar en aquella". Este principio de analogía, rige en nuestra legislación comercial y se encuentra consagrado precisamente en el artículo 1 del Código de Comercio, cuando estipula imperativamente "En los casos no regulados expresamente, se aplicarán por analogía las normas de éste Código". Siendo ello así, y concurriendo un relación jurídica previa al contrato de 1999, no escrita y de naturaleza comercial, se debe aplicar las normas de un contrato semejante a la situación existente, y siendo ello así, encontramos como contrato típico comercial, al contrato de suministro, en el cual se establece la concurrencia de compra venta de productos y la prestación de servicios en forma periódica.

En consecuencia, la relación jurídica entre GALINDO SA y FORD MOTOR COMPANY en el período comprendido entre 1995 a 1999, por analogía debe regirse por las disposiciones normativas del contrato de suministro en nuestra legislación comercial.

El mismo artículo 1 del Código de Comercio, establece que también rige el principio de supletoriedad de las normas civiles, es decir, que si se recurre a la analogía y ésta no llena el vacío deben recurrirse a las normas civiles. Supletorio, involucra "aquello que remedia una falta". En el caso sub-lite, se está en una relación jurídica previa a un contrato de concesión de derecho privado, y le es aplicable el contrato de suministro por analogía, pero al ser previa, debe recurrirse a las normas del contrato preliminar conceptualizado en el artículo 463 del Código Civil dada la inexistencia de normas atinentes a contratos preliminares en el Código de Comercio.

Lo expresado, demuestra que si bien, no es posible encasillar al contrato que existió entre GALINDO SA y FORD MOTOR COMPANY, empero, aplicando la analogía y la supletoriedad, se concluye que la relación jurídica concurrente en el período 1995 a 1999 debe regirse por las regulaciones del contrato

www.scantopdf.eu



preliminar supletoriamente y por las regulaciones del contrato de suministro por analogía.

2.3.-INCUMPLIMIENTO.-

En ese marco legal, en el simple cotejo de las fechas de la designación como concesionario exclusivo para Bolivia en septiembre de 1995 y la firma del contrato de concesión, se puede establecer, ineludiblemente que FORD MOTOR COMPANY no cumplió oportunamente la suscripción del contrato, manteniendo una relación preliminar, en la que GALINDO SA efectuó inversiones considerables, lo que al tenor de lo dispuesto por el artículo 463 parágrafo III del Código Civil, debe motivar el resarcimiento del daño producido.

En igual forma, dado la falta de cumplimiento de las prestaciones que no se ejecutaron oportunamente, resulta aplicable el resarcimiento previsto y señalado por el artículo 922 del Código de Comercio.

2.4.-CULPA PRECONTRACTUAL.-

FORD MOTOR COMPANY para la formación del contrato de concesión de 1999, incurrió en culpa precontractual dado que al momento de efectuar las exigencias de inversión en infraestructura y las erogaciones efectuadas por GALINDO SA durante la vigencia del contrato preliminar y con tal de que se vendan sus productos, esa compañía Americana omitió advertir, mencionar o señalar cuales podría ser las causas de extinción del contrato principal, con lo logró que GALINDO SA efectúe inversiones considerables que a la fecha resultan ser activos improductivos; consiguientemente no se condujo con las reglas de buena fe e incurrió en abuso de derecho, lo que al tenor del artículo 984 del Código Civil, conlleva una responsabilidad de resarcimiento de daños, más aún si fue la propia FORD MOTOR COMPANY la que dio por terminado unilateralmente el contrato suscrito en 1999, y que de haber conocido GALINDO SA que se terminaría el contrato principal en tan corto periodo no habría invertido en la vigencia del contrato preliminar.

2.5.- DAÑOS PRODUCIDOS.-

A la fecha GALINDO SA. dado el incumplimiento y la concurrencia de la culpa precontractual cuenta con activos improductivos con un valor superior a los $us.2.000.000 cuya ejecución data precisamente del periodo de la vigencia del

contrato preliminar, y por ello, no ha podido dar cumplimiento a los pagos del financiador europeo relacionado con la propia FORD MOTOR COMPANY como su afiliado, y esa ha sido la razón esencial de la propia terminación del contrato de concesión esgrimida por FORD)

Terminación unilateral que a su vez, ha determinando la imposibilidad de que GALINDO SA. siga operando con la marca FORD, y otros aspectos vinculados al contrato de 1999.

III.- DEMANDA.-

(Por lo expuesto, y respaldados en las disposiciones legales mencionadas y los artículos 327 y siguientes del Código de Procedimiento Civil, deducimos proceso de conocimiento en contra de la empresa norteamericana FORD MOTOR COMPANY, sobre resarcimiento de daños y perjuicios, solicitando que previos los trámites de rigor se declare en sentencia PROBADA la demanda y se disponga:

a)El resarcimiento de los daños y perjuicios producidos a GALINDO SA emergente de la culpa precontractual y la omisión de comunicación de las causales de terminación del contrato de concesión suscrito en 1999; que motivo las inversiones en activos improductivos.

b)El resarcimiento de los daños y perjuicios producidos con el incumplimiento de la suscripción del contrato en forma oportuna que motivó a su vez inversiones injustificadas.

c)Que los importes se liquiden en ejecución de sentencia, una vez ejecutoriada la misma.

d)La condena en costas.)

IV.-DEMANDADO Y CUANTIA.-

El demandado es la empresa de origen NORTEAMERICANO que gira bajo la razón social de FORD MOTOR COMPANY, representada por WILLIAM CLAY FORD en su condición de Presidente Ejecutivo, mayor de edad, hábil por derecho de Nacionalidad Norteamericana, con domicilio en The American Road, Dearborn, Michigan 48121-1899 en Estados Unidos de Norteamérica.

Hacemos presente que la cuantía de la presente demanda es indeterminada, debido a que el importe de los daños será liquidable en ejecución de sentencia.



D.S. 21124 de 15-11-85.
R.M. Nº 1039 de 13-11-2001

Bs 1.50

DIRECCION DISTRITAL
B. N.
CONTROL PAPEL SELLADO
29 JUL Nº 2526091
OFICINA DE Serie "A-2002"
EMISION NACIONAL CONCESIONARIO Nº
La Paz - Bolivia

OTROSI 1.- A los efectos de la citación del demandado, solicito se libre el respectivo exhorto en aplicación del artículo 114 del Código de Procedimiento Civil, debiendo imprimirse el trámite correspondiente.

OTROSI 2.- Acompaño prueba documental, la cual se encuentra en idioma inglés, acompañada de su traducción correspondiente en todos los casos, por traductor autorizado, pidiendo que se arrime a sus antecedentes.

OTROSI 3.- El abogado que nos patrocina se somete en honorarios a la iguala profesional suscrita.

OTROSI 4.- Señalamos domicilio en las oficinas del abogado que suscribe, ubicadas en la calle Chuquisaca No. 688, lugar donde deberán hacer conocer aquellas diligencias señaladas y previstas por ley.

JUSTICIA, etc.

Cochabamba, Julio 23 del 2002.

972871   CBBA

NOTA

Presentó   Enrique Galindo Huerta   C.I. N.o.
Fecha:   02-08-2002   Hrs.   16.20
Prueba Literal _____ 135   :dey 16
- Carpeta fs. (1) Mes   Alanjines 0
= Poder Fs. (2) Hjas   POR SECRETARIO DE CAMARA   SALA CIVIL SEGUNDA
- Carpeta Ford Azul fs. (1)

972871   CBBA

www.scantopdf.eu

# EXHIBIT B

FEB 19 '01 14:12 FR PROD AND MKTG PLANS  313 845 3961 TO 55867          P.01/05



# GLOBAL IMPORTER DEALER
## SALES AND SERVICE AGREEMENT

THIS AGREEMENT made at Dearborn, Michigan, United States of America as of the _19th_ day of
_April_, _1999_, by and between Ford Motor Company, a corporation organized and existing
under the laws of the State of Delaware, USA, with its principal place of business at The American Road,
Dearborn, Michigan, USA (hereinafter called the "Company"), and
AUTOMOTORES GALINDO SOCIEDAD ANONIMA

(IMPORTER DEALER-LEGAL NAME OF ENTITY)

GALINDO S.A.  CORPORATION COCHABAMBA (BOLIVIA)

(STATE WHETHER ENTITY IS AN INDIVIDUAL, PARTNERSHIP OR CORPORATION. IF A PARTNERSHIP, SHOW PLACE
WHERE REGISTERED, IF A CORPORATION, SHOW PLACE WHERE INCORPORATED.)

doing business as _____ GALINDO S.A.
(TRADE NAME)

and with its principal place of business at ____ AV. LIBERTADOR BOLIVAR # 1418
(STREET ADDRESS)

COCHABAMBA                    BOLIVIA
(TOWN)                        (COUNTRY)

(hereinafter called the "Dealer").

### PREAMBLE

The purpose of this agreement (hereinafter called the "Agreement") is to:

(1)     establish the Dealer as an authorized dealer for the sale and service of Company Products including
Company Vehicles (as hereinafter defined);

(2)     set forth the respective responsibilities of the Company in the production, offer and sale of Company
Products to the Dealer, and of the Dealer in reselling and providing service for them;

(3)     recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales,
service and profits by continuing to develop and retain a broad base of satisfied owners of Company
Products; and

(4)     identify key commitments, rights and responsibilities of the Company and the Dealer.

The goal of the Company is to establish itself as a preeminent automotive manufacturer, providing customers
with the highest level of value and customer satisfaction.

Form GIDSA 1, March 1997

··· · ·  ꓳꓲꓳ ₈ꓯꓹ ꓹꓹ₆₁ ꓔꓳ ₅₅₈₆ꓹ      P. 02/05

In order to offer the best value and customer satisfaction in markets where dealers import Company Products directly from the Company's manufacturing sources, it is the opinion of the Company that sales and service of Company Products usually can best be provided to the public through a system of independently authorized dealers selling Company Products.   .

The Company also recognizes that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of Company Products and the level of customer satisfaction during the customer's sales and service experience, and on how well each party fulfills its responsibilities under this Agreement.

Because dealers represent Company Products to the public, it is critical that dealers understand, adhere to and promote the long-term goals of the Company which are to provide customers with the highest level of value and customer service.

The Company looks to its dealers to develop the potential within their respective areas of responsibility for the sale of Company Products, to provide prompt and competent service and carry out effective owner relations programs. To this end, each dealer must provide for the importation of Company Products, maintain adequate wholesale and fully competitive retail finance plans, provide for accepting, reconditioning and selling used products where, in the opinion of the Company, it is required, and train management, sales, parts, service and administrative personnel. Failure of a dealer to carry out any of these responsibilities damages the reputation of the Dealer, Company Products, the Company, the Affiliates (as hereinafter defined), and other authorized dealers in Company Products.

In the course of satisfying customers, the Company endeavors to make available to its dealers products of high value and quality, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis. The development, production and sale of such products requires that the Company make significant investment in plants, equipment, tools, engineering, styling, quality control and trained personnel.

In the course of satisfying customers, the Dealer must provide properly located, adequate, exclusive, well-equipped and attractive facilities, which are staffed by competent, well-trained, customer-oriented personnel, and provided with the necessary management and working capital. This requires that each of the authorized dealers make important investments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories and trained sales and service personnel.

The Dealer acknowledges that its methods of operation and its business practices importantly affect the reputation of the Dealer, the Company, Company Products, other authorized dealers of the Company and Affiliates. The Dealer also acknowledges that certain practices such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices or misrepresentations as to the characteristics, quality, condition or origin of any item of sale are detrimental to the interests of both the Dealer and the Company.

Both parties have made their commitment to the relationship. If satisfactory sales volume or profit margins for either the Company or the Dealer are not realized, each may suffer because of their respective commitments. Therefore, the ultimate success of one party is dependent upon the success of the other party.

�70/1ꓱ.ꓒ   ꓹ0ꓹ6ꓱ6ꓱ6ꓱ106 0ꓕ ꓹ68ꓹ ꓹꓺ8 ꓱ1ꓱ  ꓱ∩ꓯꓡꓕ * ꓱꓷꓯꓯꓕ ꓡ.ꓕ∩I ꓤꓴ 11:91 10.61 ꓱꓱꓵ

FEB 19 '01 14:13 FR PROD AND MKTG PLANS  313 845 3961 TO 55867        P.03/05

It is the expectation of each of the parties that by entering into this Agreement, and by the full and faithful performance of its duties, a mutually satisfying relationship will be established and maintained.

IN CONSIDERATION of the foregoing and of the mutual agreements and acknowledgments hereinafter made, the parties agree as follows:

A. The Company hereby appoints the Dealer as an authorized dealer in Company Products with the right to purchase Company Products from the Company and Company authorized Affiliates for resale to retail customers. While this Agreement is in effect, the Dealer may represent itself to the public as an authorized dealer in such Company Products. The Dealer hereby accepts such appointment and agrees to fulfill its responsibilities as herein provided.

B. Subject to the provisions of this Agreement, the Company or Affiliates will sell Company Products to the Dealer on a non-exclusive basis and the Dealer will purchase Company Products from the Company or Affiliates for resale.

C. The Dealer agrees that the legal entity of the dealership shall not own, control or be financially obligated for, either directly or indirectly, another business enterprise (including any other legal entity, owned directly or indirectly, by the persons listed in paragraph F), and that the sole business of such legal entity shall be the activities contemplated by this Agreement unless otherwise agreed in writing by the Company.

D. The attached Global Importer Dealer Sales and Service Agreement Standard Provisions (Form GIDSA 1A) and its Attachments including the Standards Manual (as hereinafter defined) have been read and agreed to by each party and the Standard Provisions, and any duly executed and delivered supplement, amendment, addendum and/or attachment thereto, are hereby made a part of this Agreement.  This Agreement is being executed in three counterpart originals.

E. The Dealer agrees that:

(i)     this Agreement shall bind the Company only when it bears the signature of the Secretary or an Assistant Secretary of the Company; and

(ii)    no one except the Secretary or an Assistant Secretary of the Company is authorized on behalf of the Company to make or execute this Agreement, excluding its Attachments, or in any manner to modify the terms hereof or to terminate this Agreement, and then only by a written instrument.

F. In view of the personal nature of this Agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute any agreement relating to the sale or service of Company Products with individuals or other entities specifically selected and approved by the Company. Accordingly, this Agreement and the rights, privileges and obligations conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer, and the Dealer acknowledges that no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this Agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s) shall be the principal owners, having greater than or equal to ten percent (10%) ownership, of the Dealer:

(iii)

FEB 19 '01 14:13 FR PROD AND MKTG PLANS  313 845 3961 TO 55867          P.04/05

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| HUGO GALINDO S. | EL ESCUDAÑO # 16 | 41.31 |
| ROSARIO HUERTA DE GALINDO | EL ESCUDAÑO # 16 | 33.06 |
| HUGO GALINDO H. | Av. BANZER Km. 3½ | 3.51 |
| ENRIQUE GALINDO H. | Av. PETROLERA # 2827 | 3.51 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this Agreement, and shall devote exclusive efforts to achieve that end:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| HUGO GALINDO SALCEDO | EL ESCUDAÑO # 16 | EXECUTIVE PRESIDENT |
| HUGO GALINDO HUERTA | Av. BANZER Km. 3½ | SANTA CRUZ REGIONAL MANAGER |
| ENRIQUE GALINDO HUERTA | Av. PETROLERA # 2827 | PARTS & SERVICE MANAGER |

The Dealer shall give the Company prior written notice of any proposed change in the ownership or managerial authority, and immediate notice of the death or incapacity of any person designated in this paragraph F. No such change or notice, and no assignment of this Agreement or of any right, obligation or interest herein by the Dealer, shall be effective unless and until embodied in an appropriate written amendment to or assignment of this Agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. In the event the Company's prior written approval of any such change or assignment is not obtained, the Company shall have the right to terminate this Agreement in accordance with paragraph 13 of the Standard Provisions.

(iv)

G. (Strike out and initial paragraph G(i) or G(ii), whichever is not applicable.)

(i) This Agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 13 of the Standard Provisions.

(ii) ~~This Agreement shall continue in force and effect from the date of its execution~~
~~XXXXXXXXXX expiring XXXXXXXXXXXXXXXXXXXX unless sooner XXXXXXXXXX earlier XXXXXXXXX~~
~~XXXXX paragraph XXXXXXXXXXXXXXXXX Provisions.~~

H. Any notice required or permitted by this Agreement, or given in connection herewith, shall be in writing in the English language and may be by personal delivery, by first-class registered mail postage prepaid or by telephone facsimile or similar electronic communication confirmed by a copy delivered by means of one of the other delivery methods specified above.

Notices to the Company shall be delivered or addressed to the Secretary's Office, The American Road, Dearborn, Michigan, 48121-1899;

Notices to the Dealer shall be delivered or addressed to any person designated in paragraph F(ii) of this Agreement as having full managerial authority and responsibility for the operating management of the Dealer or to the Dealer at the Dealer's principal place of business as described herein.

IN WITNESS WHEREOF the parties have duly executed this Agreement in triplicate as of the day and year first above written.

FORD MOTOR COMPANY

By _____
MIA    (TYPED AND WRITTEN SIGNATURE)

Title    ASSISTANT SECRETARY
            (TYPED TITLE)

AUTOMOTORES GALINDO SOCIEDAD ANONIMA
GALINDO S.A.
(DEALER-NAME OF LEGAL ENTITY)

By HUGO GALINDO S.
   (TYPED AND WRITTEN SIGNATURE)

Title EXECUTIVE PRESIDENT
            (TYPED TITLE)

(v)

EXHIBIT C



**Ford Motor Company**

# Global Importer Dealer
# Sales and Service Agreement
# Standard Provisions

Form GIDSA 1A, March 1997

*Cincinnati y ride*                                    57

# Standard Provisions

Contents

1 DEFINITIONS ............................................ 1
   (a) "Affiliate" ........................................ 1
   (b) "Company Products" .......................... 1
   (c) "Dealer's Locality" ........................... 1
   (d) "Dealer Price" ................................... 1
   (e) "Company Products and Standards Manual" ............................................... 1
2 RESPONSIBILITY WITH RESPECT TO COMPANY PRODUCTS ......................... 2
   (a) Sales ................................................. 2
   (b) Orders .............................................. 2
   (c) Consideration of Orders .................... 2
   (d) Stocks .............................................. 3
   (e) Demonstrators and Service Loaners ....... 3
   (f) Owner Literature............................... 3
   (g) Allowances ...................................... 3
   (h) Warranty ......................................... 3
   (i) Customer Deposits ............................ 4
3 RESPONSIBILITY WITH RESPECT TO SERVICE ............................................. 4
   (a) General ............................................ 4
   (b) Predelivery Inspection and Conditioning 4
   (c) Warranty, Policy, Campaign, Recall and Program Service ...................................... 4
   (d) Genuine Parts ................................... 5
   (e) Maintenance and Repair Service......... 5
   (f) Service Tools and Equipment.............. 5
4 RESPONSIBILITY WITH RESPECT TO PLACE(S) OF BUSINESS AND FACILITIES................................................ 5
   (a) Location and Facilities....................... 5
   (b) Changes, Additions and Exclusive Use ... 5
   (c) Hours of Business .............................. 5

5 OTHER RESPONSIBILITIES .................. 5
   (a) Signs................................................ 5
   (b) Personnel ......................................... 6
   (c) Dealer Residence ............................... 6
   (d) Capital............................................. 6
   (e) Accounting System ............................ 6
   (f) Communications................................ 6
   (g) Reports............................................ 6
   (h) Customer Handling............................ 7
   (i) Business Practices and Advertising........... 7
   (j) Compliance with Laws, Rules and Regulations........................................... 7
6 PURCHASES FROM OTHERS AND SALES TO OTHERS.............................. 7
   (a) Company Sales ................................. 7
   (b) Sales of Competitive Products............. 8
7 DETERMINATION OF MARKET REPRESENTATION ............................... 8
   (a)  Appointment of Dealers.................... 8
   (b) Appointment of Sub-dealers .............. 8
8 TERMS AND CONDITIONS OF SALE .... 8
   (a) Prices.............................................. 8
   (b) Payment .......................................... 9
   (c) Title and Risk of Loss or Damage .......... 9
   (d) Demurrage and Diversion Liability........ 9
   (e) Invoice ............................................ 9
   (f)  Taxes.............................................. 9
   (g) Incoterms ........................................ 9
9 RECORDS, INSPECTIONS AND TESTS .10
10. AVAILABILITY AND CHANGES IN COMPANY PRODUCTS ........................10
11. TRADEMARKS AND TRADE NAMES .10
12. THE DEALER NOT AN AGENT ..........10



(a) Principal and Agent.................................... 10

(b) Labor and Management ......................... 11

13. TERMINATION ........................................ 11

(a) By Dealer at Will ................................... 11

(b) By Company Due to Events Controlled by Dealer.............................................................. 11

(c) By Company for Nonperformance by Dealer.............................................................. 12

(d) By Company or Dealer Due to Death or Physical or Mental Incapacity of a Dealer Owner ............................................................. 12

(e) By Company at Will................................. 13

(f) By Company Upon Offer of New Agreement ...................................................... 13

(g) Acts in Good Faith .................................. 13

14. DISPUTE RESOLUTION PROCESS ...... 13

15. OBLIGATIONS UPON TERMINATION OR NONRENEWAL ...................................... 14

(a) Sums Owing the Company..................... 14

(b) Discontinuance of Use of Trademarks and Trade Names........................................... 15

(c) Company Option to Repurchase Signs ... 15

(d) Warranty Work ....................................... 15

(e) Service Records....................................... 15

(f) Orders and Customer Deposits............... 15

(g) Cancellation of Orders ........................... 15

16. SUCCESSION........................................... 16

17. REACQUISITION OF COMPANY PRODUCTS AND ACQUISITION OF THE DEALER'S SPECIAL TOOLS AND EQUIPMENT ...................... 16

(a) Repurchase ............................................. 16

(b) Procedures, Delivery and Title .......... 16

(c) Payment.................................................. 17

18. DISPOSITION OF THE DEALER'S ASSETS; RIGHT OF FIRST REFUSAL

(a) Company Right to Approve Change in Ownership ......................................................

(b) Company Right of First Refusal to Purchase .........................................................

19. NEW AGREEMENT ..................................

20. ACKNOWLEDGEMENTS..........................

21. NO IMPLIED WAIVERS ...........................

22. TRANSACTIONS AFTER TERMINATION ..............................................

23. LIMITATION OF LIABILITY ...........

24. AMENDMENT...........................................

25. APPLICABLE LAW ..................................

26. SEPARABILITY ........................................

27. HEADINGS AND MARGINAL NOTES 19

ii

*Cincuenta y ocho*   58

# GLOBAL IMPORTER DEALER
## SALES AND SERVICE AGREEMENT
### STANDARD PROVISIONS

I. DEFINITIONS

As used herein, the following terms shall have the following meanings, respectively:

(a)  "Affiliate" shall mean any company or other business entity in which the Company or any subsidiary of the Company directly or indirectly owns or controls more than twenty percent (20%) of the voting stock or equity capital.

(b)  "Company Products" shall mean such of the following as may be offered in writing for sale from time to time by the Company or Affiliate to the Dealer for resale under the terms and conditions of this Agreement:

(1)  such lines, series and/or models of new vehicles as are designated from time to time by the Company to the Dealer (hereinafter called "Company Vehicles"),

(2)  new parts and accessories and remanufactured parts for Company Vehicles made or remanufactured by or for the Company (hereinafter called "Genuine Parts"), and

(3)  other products specified by the Company from time to time.

The lines, series and/or models of Company Vehicles and other Company Products initially so designated by the Company pursuant to this paragraph I(b) are set forth in Attachment 1.

(c)  "Dealer's Locality" shall mean the geographical area designated in writing to the Dealer by the Company from time to time as the area of the Dealer's sales and service responsibility for Company Products. The initial Dealer Locality is set forth in Attachment 2.

(d)  "Dealer Price" shall mean, with respect to each Company Product to which it refers, the price to the Dealer for such product, as from time to time is established by the Company or Affiliate, before deduction of any cash or other discount applicable thereto. It shall not include any amount in the nature of a predelivery or other holdback deposit or charge, any charge by the Company or Affiliate for distribution, delivery or taxes or any other charge for special items or services.

(e)  "Standards Manual" shall mean the latest Global Importer Dealer Standards Manual and amendments thereto established by the Company and furnished to the Dealer. The Standards Manual will set forth the ordering procedures, Dealer sales and service performance criteria including the Dealer's Responsibilities, and other items applicable to the sale, service and distribution of Company Products, which may be changed or revised from time to time by the Company.

## 2. RESPONSIBILITY WITH RESPECT TO COMPANY PRODUCTS

(a) **Importation and Sales.** The Dealer shall vigorously and resourcefully promote and solicit sale of Company Products in the Dealer's Locality and shall energetically develop the potential for such sales and obtain reasonable shares thereof in volumes that are satisfactory to the Company.

   (1) The Dealer's performance of its sales responsibi.. .r Company Products shall be measured by such reasonable criteria as the Company may develop from time to time as set forth in the Standards Manual. The Company will provide to the Dealer an evaluation of its performance under this paragraph 2(a) from time to time in accordance with the Standards Manual. The foregoing shall not limit the Dealer's right to make sales outside the Dealer's Locality. However, sales of Company Products for retail and fleet by the Dealer may only be made to persons intending to use the Company Product within the Dealer's country and not for export.

   (2) To this end, the Dealer shall develop, maintain and direct a trained, quality sales organization and shall conduct energetic advertising and sales promotion activities making use to a reasonable extent of such advertising, sales promotion and merchandising material of the Company as may be made available to the Dealer from time to time. The Dealer is authorized and hereby agrees to import and sell Company Products only to retail and fleet customers (i.e., customers buying for their own use and not for resale), Company authorized dealers in Company Products, and in the case of Genuine Parts, the Dealer is also authorized to sell to wholesale customers.

   (3) The Dealer shall be responsible for the importation of Company Products including but not limited to payment of all applicable taxes, duties and fees and obtainment of all applicable licenses, clearances and certificates relating to customs, vehicle homologation and foreign exchange.

(b) **Orders.** To enable the Company to schedule production efficiently, the Dealer shall furnish each month, on the date or dates and in the manner designated by the Company, an order or orders for Company Products that the Dealer will purchase during such subsequent months as shall be designated by the Company and in connection therewith, or separately, as requested by the Company, estimates of the Dealer's requirements for Company Products for such succeeding months as the Company from time to time may request. Each order shall indicate the quantity, models, specifications and desired time of shipment of Company Products, and each Company Vehicle order shall include any available optional equipment which may be required under applicable motor vehicle laws and regulations in the Dealer's Locality and, as the case may be, to permit the importation and sale of Company Vehicles therein. Each such order or estimate also shall be placed in accordance with the requirements fixed from time to time by the Company as to the minimum or maximum number of Company Products that may be ordered at any one time by the Dealer.

(c) **Consideration of Orders.** The Company or Affiliate shall give careful consideration to all orders received from the Dealer that are submitted in accordance with paragraph 2(b) and shall make reasonable efforts to fill each order of the Dealer that is accepted by it, but the Company expressly reserves, and the Affiliates shall have at the Company's direction, the right to depart from such orders in the event of changes in, or lack of availability of, standard or optional equipment. The Company and Affiliates shall not incur any liability or obligation to the Dealer for any failure to ship or for delay in shipment of accepted orders for Company Products where such failure or delay is due wholly or in part to any:

2

*circular y mse*                              54

(1)     shortage or curtailment of material, labor, transportation or utility services;

(2)     labor or production difficulty in any of its own or any of its suppliers' locations;

(3)     governmental action;

(4)     adverse change in the Dealer's credit standing if payment for the order is not to be made by cash before delivery or confirmed, irrevocable letter of credit as provided in paragraph 8(b)(i) or 8(b)(ii), respectively; or

(5)     cause beyond the Company's control.

During any period of shortage of any Company Vehicle, the Company, or Affiliate at the Company's direction, shall be entitled to give priority to those orders of Company Vehicles for resale to customers who have specifically ordered them from the Dealer.

(d)     **Stocks.** The Dealer shall maintain stocks of current models, lines, series and/or types of Company Products of an assortment and in quantities as are adequate, as may be designated in the Standards Manual or otherwise by the Company, to meet the Dealer's share of current and anticipated demand for Company Products in the Dealer's Locality, and to fulfill its sales and service responsibilities under this Agreement subject to the Company filling the Dealer's orders therefor.

(e)     **Demonstrators and Service Loaners.** The Dealer shall keep available at all times in good condition and running order for demonstration and service purposes such number of new Company Vehicles of the latest model year as recommended by the Company in the Standards Manual or otherwise, but in any event not less than one Company Vehicle.

(f)     **Owner Literature.** The Dealer shall deliver to each retail customer purchasing a Company Product any materials, including Warranty Booklets and Owner Guides, that the Company may request be furnished to retail purchasers in such form as may then currently be in effect.

(g)     **Allowances.** The Company may from time to time, in its sole discretion, provide to the Dealer certain allowances on Company Products subject to conditions and procedures as specified by the Company from time to time.

(h)     **Warranty.** The Company shall from time to time inform authorized dealers in Company Products in writing of the warranty, if any, applicable to each new Company Product and such warranty shall extend either:

(1)     from the Company to the Dealer upon the sale of each Company Product to the Dealer, in which event the Dealer shall, on its own behalf, extend its own corresponding warranty to the purchaser of each Company Product from the Dealer; or

(2)     from the Company and the Dealer to each purchaser of each Company Product from the Dealer, in which event the Dealer shall include such warranty in the form and content specified by the Company in each agreement for the sale of each Company Product to a customer, and in the case of a Company Vehicle, furnish a copy to the customer upon delivery of such Company Vehicle.

3



Such warranty SHALL BE EXPRESSLY IN LIEU OF ANY OTHER EXPRESS IMPLIED WARRANTY, CONDITION OR GUARANTEE WITH RESPECT TO THE PRODUCT OR ANY PART THEREOF, AND THERE SHALL BE NO OTHER WARRANTY INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY FITNESS FOR A PARTICULAR PURPOSE, or any other obligation of the Company Affiliates to the Dealer or the customer with respect to any Company Product or any part thereof. The issuance, administration and performance of such warranty and of claims thereunder, including the use of Genuine Parts and the keeping of records, shall be as set forth in the Company's then current Warranty and Policy Manual and supplemental instructions. The Dealer shall fulfill promptly all of its respective obligations under such Warranty and Policy Manual and supplemental instructions.

(i)    **Customer Deposits.** The Dealer shall use all reasonable efforts to safeguard each deposit of cash or property, and any proceeds therefrom, received from a customer in anticipation of a future delivery of a Company Vehicle until such delivery is consummated or until such deposits are relinquished to the Company or Affiliate at the Company or Affiliate's request.

## 3. RESPONSIBILITY WITH RESPECT TO SERVICE

(a)    **General.** The Dealer shall develop, maintain and direct a trained, competent service organization and shall render prompt, professional, courteous and willing service on all Company Product presented to its place of business for such purpose (including all Company Products purchased from another Company authorized source) in accordance with such standards and procedures as may be established by the Company from time to time in the Standards Manual or otherwise, and in accordance with all applicable motor vehicle laws and regulations in effect in the Dealer's Locality.

(b)    **Predelivery Inspection and Conditioning.** The Dealer shall inspect and condition each new Company Vehicle before delivery to a retail customer in accordance with schedules and instructions furnished from time to time by the Company.

(c)    **Warranty, Policy, Campaign, Recall and Program Service.** The Dealer shall perform all warranty and policy service on each Company Product presented to its place of business for service in accordance with the applicable warranty and policy and the provisions of the Warranty and Policy Manual or other Company instructions.   All repairs paid for or reimbursed by the Company (e.g. warranty, owner notification programs etc.) shall be performed at the Dealer's or Sub-dealer's authorized premises unless prior written consent has been obtained from the Company.  The Dealer shall also

(1)    perform campaign, recall and program service for owners and users of Company Products as may be specified in campaign, recall or program instructions issued by the Company from time to time or contained in the Warranty and Policy Manual and supplemental instructions;

(2)    submit claims to the Company for reimbursement for the parts and labor used in performing warranty, policy, campaign, recall and program service and the Company shall reimburse the Dealer in accordance with the provisions of the Warranty and Policy Manual or other Company instructions;

(3)    maintain adequate records and documents supporting such claims in accordance with the provisions of the Warranty and Policy Manual or other Company instructions; and

4

*nesseita*                                   60

(4)   promptly report to the Company and seek the Company's assistance with respect to any warranty, policy, campaign, recall or program service work which cannot be performed to the owner's or Dealer's satisfaction.

(h)   **Genuine Parts.** The Dealer shall use only Genuine Parts in performing warranty, policy, campaign, recall and program service, except as otherwise provided in the Warranty and Policy Manual, in campaign or program instructions or in other Company literature. The Dealer shall not sell or offer for sale or use in the repair of any Company Vehicle, any part that is not a Genuine Part except as otherwise provided in the Warranty and Policy Manual.

(i)   **Maintenance and Repair Service.** The Dealer shall perform all other maintenance and repair services, including, where feasible, body repair services, reasonably required by owners and users of Company Products.

(j)   **Service Tools and Equipment.** The Dealer shall acquire from the Company or a Company-approved supplier within a commercially reasonable time, and shall maintain for use in the Dealer's business in Company Products such diagnostic equipment and other tools, equipment, machinery, manuals, catalogs and technical support systems as designated by the Company in the Standards Manual as are necessary to meet the Dealer's service responsibilities hereunder.

## 4. RESPONSIBILITY WITH RESPECT TO PLACE(S) OF BUSINESS AND FACILITIES

(a)   **Location and Facilities.** The Dealer shall establish and maintain dealership facilities at a place or places of business approved in writing by the Company that are of satisfactory appearance and modern condition and adequate to meet the Dealer's responsibilities under this Agreement. The dealership facilities, including all land areas, building and improvements, shall be substantially in accordance with the guides established by the Company from time to time including, but not limited to, the guides set forth in the Standards Manual.

(b)   **Changes, Additions and Exclusive Use.** The Dealer shall not move or substantially modify or change the usage of any place or places of business or its dealership facilities for Company Products approved by the Company, nor shall the Dealer or any person named in paragraphs F(i) or F(ii) directly or indirectly establish or operate in whole or in part any other place or places of business or dealership facilities for the sale or service of Company Products, or the sale of used vehicles without the prior written consent of the Company. The Dealer agrees that its place or places of business and dealership facilities will be used exclusively to conduct the Dealer's business in Company Products, including the sale of used vehicles taken in trade from customers, unless otherwise agreed by the Company in writing.

(c)   **Hours of Business.** The Dealer shall keep such place or places of business open for business during all hours and days which are customary and lawful in the motor trade in the Dealer's Locality.

## 5. OTHER RESPONSIBILITIES

(a)   **Signs.** The Dealer shall purchase, erect and maintain signs of good appearance adequate to identify its place or places of business as an authorized sales and service establishment in accordance with the Dealership Identification Agreement to be executed between the Dealer and the Company. The Dealer agrees to purchase such signs from Company approved suppliers.

5

(b)     **Personnel.** The Dealer shall employ and train a sufficient number of competent personnel of good character including, without limitation, managers, sales personnel, parts personnel, service writers and service technicians to fulfill all of the Dealer's responsibilities under this Agreement as described in the Standards Manual, and shall cause such personnel to attend such training programs (including any New Dealer Training Seminar) as the Company may designate from time to time.

(c)     **Dealer Residence.** Effective operation of the Dealer's business is dependent in large part on the Dealer's management becoming a part of and accepted within the Dealer's Locale. Accordingly, it is expected that each person named in paragraph F(ii) shall reside within the Dealer's Locality.

(d)     **Capital.** The Dealer shall at all times employ in connection with the Dealer's business in Company Products such total investment, net working capital, adequate lines of credit and competitive retail and wholesale financing for Company Vehicles, as are in accordance with Company standards as communicated to the Dealer from time to time and will enable the Dealer to meet its sales and service responsibilities under this Agreement.

(e)     **Accounting System.** The Dealer shall install and use in the Dealer's business in Company Products and used vehicles an accounting system in accordance with Company manual of accounting procedures for its authorized dealers or such other guidelines as may be provided by the Company to the Dealer from time to time.  Such system shall be given priority in use by the Dealer but shall not be exclusive of any other system the Dealer may desire to use.

(f)     **Communications.** To achieve the highest standards of communication and to promote efficiency and the use of current technology to meet training and other needs, the Company may from time to time develop and maintain programs designed to improve communication and the exchange of information between the Company, its Affiliates, and the Dealer.   The Dealer agrees to participate in such programs as established by the Company and make appropriate purchases where required by the Company.  In addition, the Company shall provide to the Dealer certain materials necessary for the sale and service of Company Products.  The Dealer agrees to pay all applicable charges for these materials identified by the Company.

(g)     **Reports.** The Dealer shall furnish to the Company:

    (1)     complete, accurate and true statements of the financial condition and month and year-to-date operating results of the Dealer's business in Company Products and used vehicles at the times and in the manner prescribed by the Company; and

    (2)     such sales and other reports, including without limitation, specific daily sales data, as the Company from time to time may require.

All such statements and reports furnished pursuant to paragraphs 5(g)(1) and 5(g)(2) above shall be based whenever applicable upon the accounting system referred to in paragraph 5(e) above.

6

(h) **Customer Handling**. Success in the marketplace depends on the ability of the Dealer to provide a quality sales and service experience to the customer. The Dealer must, based on the programs developed by the Company as described in the Standards Manual or otherwise, including compliance with customer satisfaction standards adopted by the Company, and based on standards, training and programs developed by the Dealer, use its best efforts to achieve each customer's complete satisfaction with respect to Company Products, including sales, service, warranty fulfillment and any other matter related to customer satisfaction of Company Products. The Company will provide to the Dealer an evaluation of its performance under this paragraph 5(h) from time to time in accordance with the Standards Manual. In addition, the Dealer shall not make directly or indirectly any false or misleading statement or representation to a customer as to any Company Product, as to its source, condition or capabilities, as to the prices or charges or as to charges for distribution, delivery, taxes or other items.

(i) **Business Practices and Advertising**. The Dealer shall conduct business in a manner that will reflect favorably at all times on the good name and reputation of the Dealer, the Company, its Affiliates, Company Products and other dealers in Company Products, the trademarks and trade names used or claimed by the Company or its Affiliates, and shall avoid in every way any deceptive, misleading, confusing or illegal advertising or business practice and withdraw any such advertising or promotion upon being notified by the Company that it does not comply with the obligations of this paragraph 5(i). The Dealer shall become a member of the advertising or similar dealer cooperative association, which may be managed by the Company, when initiated, as described in the Standards Manual or otherwise by the Company, and pay all applicable charges associated with such membership.

(j) **Compliance with Laws, Rules and Regulations**. The Dealer shall comply with all applicable laws, rules and regulations in the ordering, sales and service of Company Products and the sale and service of used vehicles, including without limitation, those related to importation procedures, foreign exchange transactions, vehicle homologation certification, motor vehicle safety, emissions control and customer service.

## 6. PURCHASES FROM OTHERS AND SALES TO OTHERS

(a) **Company Sales**. The Company and Affiliates reserve the right to make sales to others including, without limitation, other dealers, national and local governments, or any departments thereof, leasing companies, rental companies, body-builders, multinational companies or charitable institutions without liability of any kind to the Dealer. The Dealer shall turn over to the Company, when requested by the Company, inquiries or orders received by the Dealer from the government of any country or any political subdivision thereof, or any department thereof, rental companies or charitable institutions. The Company shall have no obligation to pay to the Dealer any commission, remuneration or charge for handling with respect to any inquiries or orders so turned over by the Dealer, unless:

(1) such inquiries or orders result in a sale; and

(2) the Dealer agrees to provide and does provide for the Company Products sold pursuant to such inquiries or orders predelivery inspection and conditioning, warranty, policy, campaign and program and after-sale service on the same basis as required with respect to Company Products sold by the Dealer under this Agreement.



The amount of any commission, remuneration or charge paid to the Dealer with respect inquiries or orders qualifying under the preceding sentence shall be determined by the Compa in its sole discretion.

(b)   **Sales of Competitive Products.** The Dealer agrees not to engage in any manner, directly indirectly, in the sale of any new motor vehicle or integral parts thereof or accessories for u therewith which are competitive with Company Products unless the prior written consent of th Company is obtained.

## 7. DETERMINATION OF MARKET REPRESENTATION

(a)   **Appointment of Dealers.** The Company reserves the right to determine from time to time in it best judgment the numbers, locations and sizes of authorized dealers necessary for proper and satisfactory sales and service representation for Company Products within and without th Dealer's Locality, and to appoint additional dealers in Company Products within or without th Dealer's Locality without liability of any kind to the Dealer. The Company reserves the right to offer to others, without any obligation to the Dealer, any new, different or differently designated Company Products bearing any trademarks or trade names used or claimed by the Company or any Affiliate.

(b)   **Appointment of Sub-dealers.** With the written consent of the Company, the Dealer may appoint sub-dealers of the Dealer for the sale and/or service of Company Products at a location separate from the Dealer's place of business, but within the Dealer's Locality. All such appointments shall be in accordance with terms and standards established by the Company from time to time, shall be made by execution of a sub-dealer agreement satisfactory in form and content to the Company and shall be subject to the prior written approval of the Company. The Dealer hereby agrees that, upon the Company's withdrawing its consent to the appointment of any sub-dealer hereunder, such Dealer will terminate any and all agreements appointing such sub-dealer as soon as possible in accordance with the terms of such agreement(s).

## 8. TERMS AND CONDITIONS OF SALE

(a)   **Prices.** The Dealer shall pay the Company or Affiliate for Company Products purchased from the Company or Affiliate the Dealer Price as from time to time is established by the Company or Affiliate, less any applicable cash or other discounts, plus any additional charges made by the Company including but not limited to:

   (1)   distribution and delivery;

   (2)   advertising;

   (3)   taxes on the use or sale of such Company Products to the extent such taxes are not included in the Dealer Price of the Company Products; and

   (4)   transportation, insurance, packing, loading, delivering and other handling charges, gasoline, oil, antifreeze and other special items or services.

Such Dealer Price, cash or other discounts and additional charges may be changed from time to time by the Company or Affiliate without prior notice or obligation to the Dealer.

8

Payment. Payment for Company Products purchased by the Dealer from the Company or Affiliate shall be at the Company's election by means of:

(1)  cash before delivery in United States Dollars or in the currency designated on the invoice.

(2)  confirmed, irrevocable letters of credit or financing commitment opened and confirmed by such banks or finance sources and containing such terms and conditions that are acceptable to the Company or Affiliate.

(3)  such other means as the invoice may provide, in which event the terms of the invoice shall govern.

Receipt of any check, draft or other commercial paper shall not constitute payment until the Company or Affiliate shall have received cash in the full amount thereof. The Dealer shall pay all collection charges and all currency exchange costs, if any.

(k)  **Title and Risk of Loss or Damage.** Unless the Dealer has been notified in writing of a change in the Company's policy toward title and risk of loss or damage or the invoice provides otherwise, title and all risk of loss or damage to Company Products shall pass to the Dealer upon delivery FAS port of export for transport to the Dealer. Until payment for Company Products has been effected, however, the Company or Affiliate shall retain a security interest in and the right to retake and resell such Company Products. The Company or Affiliate shall have the right to sell, transfer or assign its security interest in, and its right to retake and resell, such Company Products to banks, finance institutions, or other purchasers, transferees, or assignees of its choosing at any time, and such security interest and right to retake and resell shall not be extinguished or be deemed to be extinguished upon any sale, transfer or assignment by the Company or Affiliate of the Dealer's payment obligation to the Company or Affiliate, or upon the Company's or Affiliate's receipt of payment from a bank or finance institution on behalf of the Dealer if such security interest is transferred or assigned to such bank or finance institution.

(d)  **Demurrage and Diversion Liability.** The Dealer shall be responsible for and pay any and all demurrage, storage and other charges accruing after delivery of Company Products, and any and all additional costs and expenses incurred by the Company or Affiliate as a result of the Dealer's cancellation of a Company Product order or refusal or failure to take delivery of a Company Product ordered by the Dealer.

(e)  **Invoice.** Sale of Company Products to the Dealer shall be subject to such other terms and conditions as specified in the invoice covering such Company Products or as otherwise specified by the Company in writing.

(f)  **Taxes.** The Dealer is responsible for all taxes and tax returns related to the Dealer's business in Company Products and will hold the Company and Affiliates harmless from any related claims or demands made by any taxing authority.

(g)  **Incoterms.** All trade terms shall be construed in accordance with Incoterms 1990 (International Rules for the Interpretation of Trade Terms) or subsequent revisions and amendments thereto.

9

## 9. RECORDS, INSPECTIONS AND TESTS

The Dealer shall allow persons designated by the Company at reasonable times and intervals to examine the Dealer's business in Company Products, place or places of business, facilities, operations, Company Products and used vehicles, and vehicles in for service or repair, to test the Dealer's equipment, to check and instruct the Dealer and its employees in the proper handling of warranty and other repairs and claims based thereon, and to examine, copy and audit any or all of the Dealer's records and documents. The Dealer agrees that the Company or Affiliate may charge back to the Dealer all payments or credits made by the Company or Affiliate to the Dealer which were improperly claimed or paid. The Dealer shall maintain all records and documents including journals and ledgers, which relate in any way, in whole or in part, to the Dealer's business in Company Products including records used as a basis for submission of warranty and policy claims to the Company or Affiliate for two (2) years. It is recommended that the Dealer maintain service records for a sufficient period of time to meet its customer concerns.

## 10. AVAILABILITY AND CHANGES IN COMPANY PRODUCTS

The Company, or an Affiliate with the concurrence of the Company, may at any time and from time to time reduce or discontinue the supply of or change the design of any Company Product, or supply any new or different line, series and/or model of any Company Product without notice and without any liability or obligation to the Dealer, including without limitation, any obligation with respect to any Company Product ordered or purchased by or delivered to the Dealer.

## 11. TRADEMARKS AND TRADE NAMES

The Dealer shall not contest the right of the Company or any Affiliate to the exclusive use of any trademark or trade name used or claimed by the Company or any Affiliate, and upon the written request of the Company, the Dealer shall immediately cease or modify, as requested by the Company, any use or infringement by the Dealer of any such trademark or trade name. The Dealer shall use, and shall have permission to use, the word "Ford" or any other trademark or trade name used or claimed by the Company or any Affiliate, coined words or combinations containing the same parts thereof, only in connection with business conducted by the Dealer contemplated and defined by this Agreement. The Dealer shall not use any such trademark, trade name, coined word or combination in, or as a part of, the Dealer's firm name or trade name without the prior written consent of the Company. The Dealer shall not have or acquire, either by usage, custom or operation of law, any right to any such trademark, trade name, coined word or combination other than as contemplated herein.

## 12. THE DEALER NOT AN AGENT

(a)   **Principal and Agent** This Agreement does not in any way create a principal-agent relationship between the Company and the Dealer, and under no circumstances shall the Dealer be considered to be the agent of the Company. The Dealer shall not act or attempt to act or represent itself directly or by implication, as an agent of the Company or in any manner assume or create, or attempt to assume or create, any obligation on behalf of or in the name of the Company.

10

**Labor and Management**

(1)     This Agreement does not in any way create a labor-management relationship between the Dealer and the Company and under no circumstances shall the Dealer be considered an employee of the Company.

(2)     This Agreement does not in any way create a labor-management relationship, or any other relationship, between any of the Dealer's employees and the Company, and under no circumstances shall any such relationships be considered to exist.

**B. TERMINATION**

1.   Dealer at will. The Dealer ...

2.   Company ... such ... the Company ... and which are so contrary to the intent and purpose of this Agreement as to warrant its termination effective immediately at any time upon the Company's giving written notice to the Dealer thereof:

Any transfer or attempted transfer by the Dealer of any interest in, or right, privilege or obligation under this Agreement, or transfer by operation of law or otherwise, of the principal assets of the Dealer ...

(2)     Any misrepresentation in applying for this Agreement by the Dealer or any person named in paragraph F; any misrepresentation by the Dealer as to any person named in paragraph F; or submission by the Dealer to the Company or an Affiliate of any false or fraudulent application, claim, statement or report relating to the Dealer's business in Company Products.

(3)     Insolvency of the Dealer, inability of the Dealer to meet debts as they mature, filing by the Dealer of any documents in connection with any bankruptcy, receivership or related law, adjudication of the Dealer as bankrupt or insolvent under any such law, or execution of an assignment by the Dealer for the benefit of creditors; dissolution of the Dealer; ... failure of the Dealer for any reason to function in the ordinary course of business, or to maintain the Dealer's business in Company Products open for business during all customary hours as set forth in paragraph 4.

(4)     Conviction in court of the Dealer or any person named in paragraph F for any violation of law, or any conduct by any such person unbecoming a reputable businessperson, or disagreement between or among any persons named in paragraph F, which in the Company's opinion tends to affect adversely the operation or business of the Dealer or the good name, goodwill or reputation of the Dealer, other authorized dealers of the Company, the Company, Affiliates or Company Products.

(5)     The Dealer shall have engaged, after written warning by the Company, in any business practice or advertising contrary to the provisions of paragraph 5(i) of this Agreement.

11


2

executor or representative of such deceased or incapacitated owner shall so request and shall demonstrate to the satisfaction of the Company the ability to carry out the terms and conditions of this Agreement.

**By Company at Will.** If this Agreement is not for a stated term specified in paragraph G(ii) of this Agreement, the Company may terminate this Agreement at will at any time by giving the Dealer at least one hundred and twenty (120) days prior written notice of the effective date thereof.

**By Company Upon Offer of New Agreement.** The Company may terminate this Agreement at any time by giving the Dealer at least thirty (30) days prior written notice of the effective date thereof in the event the Company offers a new or amended form of agreement to its authorized dealers in Company Products.

**Acts in Good Faith.**

(1)  The Dealer acknowledges that each of its responsibilities under this Agreement is reasonable, proper and fundamental to the purpose of this Agreement and that (i) its failure to fulfill any of them would constitute a material breach of this Agreement, (ii) the occurrence of any of the events set forth in paragraphs 13(b) and (c) would seriously impair fundamental considerations upon which this Agreement is based, and (iii) the rights of termination reserved in the events specified in paragraph 13(f) are necessary to permit the Company to remain competitive at all times. The Dealer acknowledges that any such failure, occurrence or event constitutes a reasonable, fair, good, due and just cause and provocation for termination of this Agreement by the Company.

(2)  The Dealer agrees that if the Company or any of its representatives (i) requests the Dealer to fulfill any of such responsibilities, (ii) believes that any such failure, occurrence or event is occurring or has occurred and advises the Dealer that, unless remedied, such failure, occurrence or event may result in Company termination of this Agreement, (iii) gives the Dealer notice of termination, or terminates this Agreement, because of any such failure, occurrence or event, then such request, advice, notice or termination shall not be considered to constitute or be evidence of coercion or intimidation, or threat thereof, or to be unreasonable, unfair, undue or unjust, or to be not in good faith.

## 14. DISPUTE RESOLUTION PROCESS

The Company and the Dealer recognize that disputes may occur which cannot be resolved in the normal course of business. In the event any such dispute, claim or controversy arises between the parties in connection with the breach, implementation, invalidity or termination of this Agreement and any and all Attachments thereto, the following procedure shall be implemented and shall constitute the exclusive recourse of the parties:

(a)  The Company and the Dealer shall hold a meeting promptly, attended by persons with decision-making authority regarding the dispute, to attempt in good faith to negotiate a resolution of the dispute; provided, however, that no such meeting shall be deemed to vitiate or reduce the obligations and liabilities of the parties hereunder or be deemed a waiver by a party hereto of any remedies to which such party would otherwise be entitled hereunder.

13

(b)     If, within thirty (30) days after such meeting, the Company and the Dealer have succeeded in negotiating a resolution of the dispute, they agree to submit the dispute binding arbitration in accordance with the United Nations Commission on Trade 1 (herein after referred to as "UNCITRAL") Arbitration Rules in effect on the date of Agreement.

(1)     The appointing authority shall be the American Arbitration Association

(2)     The case shall be administered by the American Arbitration Association accordance with its "Procedures for Cases under the UNCITRAL Arbitration Rules."

(3)     The parties will jointly appoint a mutually acceptable arbitrator, seeking assistance in such regard from the American Arbitration Association if they have been unable to agree upon such appointment within 30 days after commencement of arbitral proceedings.

(4)     The costs of arbitration shall be borne by the losing party.

(5)     If either party fails to observe the terms of the arbitration award, the other party may apply to have the award enforced in any courts having jurisdiction over the party against which the award has been rendered.

(6)     All proceedings in any such arbitration shall be conducted in English and a daily transcript in English of such proceedings shall be prepared.

(7)     Binding arbitration shall take place in the State of Michigan unless otherwise agreed by the parties in writing. The substantive and procedural law of the State of Michigan, without regard to its conflict of laws rules, shall apply to the proceedings and the parties agree to accept such jurisdiction. Equitable remedies shall be available in any arbitration. Punitive damages shall not be awarded. This Paragraph 14 is subject to the Federal Arbitration Act, 9 U.S.C.A. (United States Code Annotated) § 1 et seq. and judgment upon the award rendered by the Arbitrator, if any, shall be final and binding upon the parties.

The Company and the Dealer agree that the dispute resolution process outlined in this paragraph 14 which includes binding arbitration, shall be the exclusive mechanism for resolving any controversy or claim between them arising out of or relating in any way to this Agreement including all attachments hereto, its creation, interpretation, implementation, invalidity or termination.

## 15. OBLIGATIONS UPON TERMINATION OR NONRENEWAL

Upon termination or nonrenewal of this Agreement, the Dealer shall cease to be an authorized dealer in Company Products and shall immediately comply with the obligations listed below.

(a)     **Sums Owing the Company.** The Dealer shall pay to the Company or Affiliate all sums owing to the Company or Affiliate.

14

nuance of Use of Trademarks and Trade Names. The Dealer shall at its own expense:

remove all signs erected or used by the Dealer, and bearing the name "Ford" or any other trademark or trade name used or claimed by the Company or any Affiliate, (except as such use may be permitted under existing agreements with the Company relating to products of the Company or any Affiliate other than Company Products), or any word indicating the Dealer is an authorized dealer in Company Products,

erase or obliterate from letterheads, stationery, business forms and other papers used by the Dealer or by any business associated or affiliated with the Dealer the word "Ford" and all other above described trademarks and trade names, and all words indicating that the Dealer is an authorized dealer in Company Products,

)    permanently discontinue all advertising of the Dealer as an authorized dealer in Company Products,

4)    refrain from doing anything whether or not specified above that would indicate the Dealer is or was an authorized dealer in Company Products, and

(5)    remove any such trademark, trade name, coined word or combination which has been used, with the prior permission of the Company, in the Dealer's firm name or trade name.

If after termination or nonrenewal of this Agreement the Dealer shall fail or refuse to comply with any of the requirements of this paragraph 15(b), the Dealer shall reimburse the Company for any costs and expenses including, without limitation, any attorney's fees incurred by the Company in connection with any action taken to enforce compliance with this paragraph 15(b).

**Company Option to Repurchase Signs.** The Company may, at its option, require the Dealer to sell any signs referred to in paragraph 15(b) to the Company according to the terms and conditions of the Dealer Identification Agreement.

(d)    **Warranty Work.** The Dealer shall cease to be eligible to receive reimbursement from the Company with respect to any work thereafter performed or part thereafter supplied under any warranty or policy applicable to any Company Product, unless specifically authorized by the Company in writing to perform such work and then only in the manner and for the period of time set forth in such authorization.

(e)    **Service Records.** The Dealer shall deliver to the Company or its nominee all of the Dealer's records with respect to predelivery, warranty, policy, campaign and other service work of the Dealer.

(f)    **Orders and Customer Deposits.** The Dealer shall transfer or assign by appropriate documents to the Company, or its nominee, all orders for Company Products which the Dealer has not filled and all cash deposits made thereon, and deliver to the Company or its nominee the names and addresses of the Dealer's existing and prospective customers for Company Products.

(g)    **Cancellation of Orders.** At the option of the Company, each order for a Company Product received from the Dealer and unfilled on the effective date of termination or expiration of this Agreement shall be canceled.

15

## 16. SUCCESSION

Any principal owner named in paragraph F(i) hereof may appoint a nominee successor by submitting nominee successor's name in the manner designated by the Company. In the event of the death, physical or mental incapacity of the principal owner, the nominee, together with any other remaining principal owners named in paragraph F(i) ("Other Owners") shall present to the Company in writing ownership and operating plan as required by the Company relating to the continued operation of Dealer as an authorized dealer in Company Products or any proposed, new successor dealership. The Company, in its sole discretion and within a commercially reasonable time, shall determine if Company shall terminate this Agreement in accordance with paragraph 13, or a Global Importer Dealer Sales and Service Agreement shall be offered to the proposed, new successor dealership by reviewing the ownership and operating plan proposed and determining if the nominee and Other Owners appropriately qualified to own and operate the Dealer or the proposed, new successor dealership. To enable the Company to make such determination, the nominee and Other Owners shall provide information and data requested by the Company.

## 17. REACQUISITION OF COMPANY PRODUCTS AND ACQUISITION OF THE DEALER'S SPECIAL TOOLS AND EQUIPMENT

(a)  **Repurchase.**  Upon the expiration or termination of this Agreement, the Company, or a nominee, may, at its option, purchase the following dealership assets:

   (1)  Each unused, undamaged and unsold Company Product in the Dealer's stock on the effective date of such termination or expiration of the Agreement, provided such Company Product is (i) in first-class salable condition, (ii) has not been altered outside the Company's factory, (iii) was purchased by the Dealer from the Company prior to giving or receiving notice of termination or the expiration of the Agreement, or was purchased by the Dealer from another authorized dealer in Company Products no more than twelve (12) months prior to giving or receiving notice of termination or the expiration of the Agreement, and (iv) with respect to Company Vehicles, is of a then current model, and with respect to Genuine Parts, is unopened and is offered for sale by the Company in its then current parts list. The price for such Company Product shall be its Dealer Price, plus the Company's charges for distribution, delivery and taxes, at the time it was purchased from the Company, less all allowances paid or applicable allowances offered thereon by the Company.

   (2)  All special tools and automotive service equipment owned by the Dealer on the effective date of termination or expiration of the Agreement which were designed especially for servicing Company Vehicles, which are of the type recommended in writing by the Company to the Dealer and designated as "special" tools and equipment by the Company, which are in usable and good condition except for reasonable wear and tear, and which were purchased by the Dealer within the three (3) year period immediately preceding the effective date of termination or expiration of the Agreement. The price for each special tool and item of automotive service equipment shall be in accordance with the depreciation schedule in the Standards Manual in effect as of the effective date of termination.

(b)  **Procedures, Delivery and Title.**  Upon exercise of this option, the Dealer agrees and consents that the Company, or its nominee, may enter the premises of the Dealer to take an inventory and accounting of the dealership assets. The Dealer shall return all property to be purchased by the

16

Company pursuant to paragraph 15(c) and this paragraph 17 in accordance with the procedures and timetables then established by the Company. The Dealer warrants good clear title to all such property, and shall furnish to the Company evidence satisfactory to the Company that such property is free and clear of all claims, liens and encumbrances.

Payment. The Company shall pay the Dealer for the property purchased by it pursuant to paragraph 15(c) and this paragraph 17 within a reasonable time following the Dealer's fulfillment of all of the Dealer's obligations under paragraph 15 and this paragraph 17 subject to offset of any obligations owing by the Dealer to the Company.

## DISPOSITION OF THE DEALER'S ASSETS; RIGHT OF FIRST REFUSAL

Company Right to Approve Change in Ownership. In view of the nature, purposes and objectives of the Company's Dealer Sales and Service Agreements, and the differences in operating requirements among dealerships of differing sizes and types of markets, the Company expressly reserves the right to select the dealers with whom it will enter into such agreements so as to maintain as high quality a dealer organization as possible. In the event this Agreement is actually terminated or not renewed by either party or if the Dealer anticipates that the Dealer will terminate or not renew this Agreement, the Company acknowledges that the Dealer has the right to negotiate for the sale of the assets of the Dealer at such price as may be agreed upon by the Dealer and the prospective purchaser. In turn, the Dealer acknowledges that the Company has the right to approve or decline to approve any prospective purchaser as to his or her character, automotive experience, management, capital and other qualifications for appointment as an authorized dealer in Company Products for the dealership business involved. If, in the opinion of the Company, the price to be paid for such assets appears, on the basis of the average operating results of other dealers, to result in an unsatisfactory return on investment so that such prospective purchaser (1) may not remain as a dealer, or (2) may be impelled to sell Company Products at high noncompetitive prices with a probable reduction in sales volume, the Company may without liability to the Dealer, counsel with such prospective purchaser regarding such opinions.

(b)   Company Right of First Refusal to Purchase.

(1)   In the event of a proposed change in ownership of the Dealer or transfer by sale or otherwise of the dealership business or the Dealer's principal assets to any person or entity conditioned upon the Company entering into a Global Importer Dealer Sales and Service Agreement with that person or entity, the Company shall have a Right of First Refusal to purchase the ownership interest or assets proposed to be sold or transferred on the same terms and conditions offered or agreed to with such person or entity, regardless of whether the proposed buyer or transferee is qualified to be a dealer.

(2)   To exercise its Right of First Refusal, the Company must notify the Dealer in writing within thirty (30) days of its receipt of the completed proposal for the proposed sale or transfer that it intends to exercise its Right of First Refusal.

(3)   Upon the Company's request, the Dealer shall provide all documents relating to the proposed sale or transfer. The Company shall have the right to inspect the assets, including real estate proposed to be sold or transferred before exercising its Right of First Refusal.

17

(4)     The Company's Right of First Refusal under this paragraph 18(b) may be assigned to a third party ("Assignee"). If there is an assignment, the Company will guarantee payment of the purchase price by the Assignee. The Company shall have the opportunity to discuss the terms of the proposed sale or transfer with any potential Assignee.

(5)     The Company's rights hereunder are binding on and enforceable against any successor interest of the Dealer or purchaser or transferee of the ownership interest, dealership business or the Dealer's principal assets. When the proposed change of ownership involves a transfer by a principal owner solely to a member or members of his or her immediate family, or to a qualifying member of Dealer management, the Company's Right of First Refusal will not apply. An "immediate family member" shall be a spouse, child, grandchild, spouse of a child or grandchild, brother, sister or parent of a principal owner. A "qualifying member of the Dealer's management" shall be an individual who has been employed by the Dealer in the dealership for at least four years and is otherwise qualified as a dealer operator.

(6)     The Company shall pay the reasonable expenses, including attorney's fees which do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients, incurred by the proposed new owners or transferees prior to the Company's exercise of its Right of First Refusal in negotiating the contract for the proposed sale or transfer of the ownership interest, dealership business or principal assets of the Dealer.

(7)     Notwithstanding the foregoing, no payment of expenses or attorney's fees pursuant to this paragraph 18(b) shall be required if the Dealer has not submitted or caused to be submitted an accounting of those expenses within thirty (30) days of the Dealer's receipt of the Company's written request for such an accounting. The Company may request the accounting of such expenses incurred prior to the time of such request before the exercise by the Company of its Right of First Refusal.

## 19. NEW AGREEMENT

The termination or nonrenewal of this Agreement by the Company in connection with the offer by the Company of a new sales and service agreement for one or more Company Products to the Dealer or the Dealer's successor in interest shall not give rise to the rights and obligations provided in paragraphs 15 and 17 with respect to the Company Products included in such new agreement, unless otherwise specified by the Company in writing.

## 20. ACKNOWLEDGMENTS

This Agreement terminates and supersedes all other agreements exclusively between the parties concerning the Dealer's business in Company Products (with the exception of any of the Dealer's unfilled orders for any Company Products) and constitutes the entire agreement between the parties with respect to the subject matter hereof. Each party acknowledges that, except as expressly set forth herein, no representation, understanding or presumption of law or fact has been made or relied upon (a) which has induced the execution of this Agreement or would in any way modify any of its provisions, or (b) with respect to the effectiveness or duration of this Agreement or the sales or profit expectancy of the Dealer's business in Company Products. The Dealer further acknowledges that it has voluntarily entered into this Agreement without coercion or intimidation or threats thereof from the Company, and that each of its provisions is reasonable, fair and equitable.

18

## IMPLIED WAIVERS

...as expressly provided in this Agreement, the waiver by either party, or the failure by either party ...claim a breach of any provision of this Agreement shall not be, or be held to be, a waiver of any ...quent breach, or affect in any way the effectiveness of such provision.

## TRANSACTIONS AFTER TERMINATION

...the event that after termination or nonrenewal of this Agreement, either party has any business ...rations with the other party, such relations shall not constitute either a renewal of this Agreement or a ...iver of such termination or nonrenewal, but all such relations shall be governed by terms identical ...th the provisions of this Agreement relating thereto and by such supplemental terms and conditions as ...e Company may determine unless the parties execute a new agreement superseding this Agreement.

## LIMITATION OF LIABILITY

...he requirements of this Agreement as to the facilities to be supplied by the Dealer, the conduct of the ...business contemplated under this Agreement and the relationships between the Dealer and others are ...ntended only to promote the general purpose of this Agreement as outlined in the introductory ...paragraphs hereto. This Agreement contemplates that the Dealer shall acquire the Dealer's own place or ...places of business, facilities and equipment in accordance with the Dealer's own discretion and shall ...purchase and sell Company Products as the Dealer's own, all in conformity with the requirements and ...limitations herein specified but otherwise in the Dealer's own discretion. Except as specifically provided ...otherwise in this Agreement, nothing herein contained shall impose any liability on the Company for any ...expenditure made or incurred by the Dealer in preparation for performance or in performance of the ...Dealer's obligations under this Agreement.

## 24. AMENDMENT

Notwithstanding anything in this Agreement to the contrary, the Company shall have the right to amend, modify or change this Agreement in case of legislation, government regulation or changes in circumstances beyond the control of the Company that might affect materially the relationship between the Company and the Dealer.

## 25. APPLICABLE LAW

The Dealer and the Company intend this Agreement to be governed by and construed in accordance with the laws of the State of Michigan, United States of America. The United Nations Convention on Contracts for the International Sale of Goods is expressively excluded from and shall not apply to this Agreement on transactions hereunder.

## 26. SEPARABILITY

If any provision of this Agreement is invalid, unenforceable or prohibited by law, the Company may elect either to terminate this Agreement in its entirety or consider this Agreement divisible as to such provision and such provision shall be inoperative and the remainder of this Agreement shall be valid and binding and of like effect as though such provision were not included herein.

## 27. HEADINGS AND MARGINAL NOTES

Any headings and marginal notes herein are inserted for convenience only and shall not be deemed to form part of this Agreement or to govern or affect the meaning of any of the terms hereof.

19



# EXHIBIT D



## SEÑOR JUEZ SÉPTIMO DE PARTIDO EN LO CIVIL

Excepción de arbitraje

Otrosí 1°.- Adjunta poder.

Otrosí 2°.- Presenta prueba literal y hace presente.

Otrosí 3°.- Honorarios profesionales.

Otrosí 4°.- Domicilio procesal.

SANDRA YAÑEZ EID, boliviana, divorciada, de profesión abogada, mayor de edad y hábil por ley, identificada mediante Cédula de Identidad N° 3027222 Cbba., domiciliada en Edificio Pinto Palace Piso 2 Oficina 210 de la ciudad de Cochabamba, en representación de la empresa FORD MOTOR COMPANY, cual consta en el mandato que acompaña al presente memorial, se presenta ante las consideraciones de su autoridad y respetuosamente expone y pide:

1. Apersonamiento

Tal como se acredita por el Testimonio N° 493/2003 que se adjunta al presente escrito, la empresa FORD MOTOR COMPANY, con domicilio válido y existencia legal de acuerdo a las leyes del Estado de Delaware de los Estados Unidos de Norteamérica, con domicilio en el estado de Michigan de los Estados Unidos de Norteamérica, me ha concedido facultades de apersonarme ante vuestras autoridades en su representación.

Dicho testimonio de poder encuentra su validez y fundamento en lo dispuesto por los artículos 415 (ACTOS AISLADOS), 417 (AUTENTICACIÓN DE DOCUMENTOS) y 420 (REPRESENTANTES) del Código de Comercio Boliviano ya que: i) FORD MOTOR COMPANY no ejerce actos habituales de comercio en Bolivia por lo cual no se encuentra obligada a matricularse en el Registro de Comercio; ii) El poder otorgado ha cumplido con todos los pasos necesarios y legalizaciones para ser válido, de acuerdo a las leyes bolivianas; y iii) respecto al mismo se ha cumplido el requisito de inscripción en el Registro de Comercio a fin de que éste tenga pleno valor legal ante terceros.

En base a lo anterior, solicito respetuosamente a su probidad, que en aplicación de los artículos 58, 60 y 402 parágrafo II del Código de Procedimiento Civil, acepte mi personería y, en consecuencia, se me haga conocer futuras diligencias y actos procesales y se provea el contenido del presente memorial.

2. Antecedentes

El 2 de agosto de 2002, Enrique Galindo Huerta, en su condición de representante legal de la Sociedad Anónima Automotores Galindo S.A., dedujo proceso de conocimiento en contra de FORD MOTOR COMPANY, proceso que actualmente se encuentra radicado ante el despacho a cargo de su autoridad.

En dicha oportunidad, presentó una serie de documentos en idioma Inglés acompañados de sus traducciones de parte.

www.scantopdf.eu

Debido a que FORD MOTOR COMPANY no poseía domicilio ni representante legal en la República, se dispuso su citación mediante exhorto, diligencia que fue llevada a cabo en los Estados Unidos de Norteamérica.

Mediante el presente memorial, al Amparo del artículo 12 de la Ley de Arbitraje y Conciliación N° 1770, en nombre y representación legal de FORD MOTOR COMPANY, presento excepción de arbitraje en el mencionado proceso, en base a las consideraciones de hecho y de derecho que se exponen a continuación.

3. Petición del demandante

En el numeral III. del memorial por el cual se deduce el proceso de conocimiento, el demandante textualmente señala:

*"III. DEMANDA.-*

*Por lo expuesto; y respaldados en las disposiciones legales mencionadas y los artículos 327 y siguientes del Código de Procedimiento Civil, deducimos proceso de conocimiento en contra de la empresa norteamericana FORD MOTOR COMPANY, sobre resarcimiento de daños y perjuicios, solicitando que previos los trámites de rigor se declare en sentencia PROBADA la demanda y se disponga:*

*a) El resarcimiento de los daños y perjuicios producidos a GALINDO S.A. emergente de la culpa precontractual y la omisión de comunicación de las causales de terminación del contrato de concesión suscrito en 1999, que motivó las inversiones en activos improductivos.*

*b) El resarcimiento de los daños y perjuicios producidos con el incumplimiento de la suscripción del contrato en forma oportuna que motivó a su vez inversiones injustificadas.*

*c) Que los importes se liquiden en ejecución de sentencia una vez ejecutoriada la misma.'*

*d) La condena en costas".* (Las negrillas y el subrayado son nuestros)

De la trascripción del anterior petitorio se demuestra incontrastablemente que la demanda se centra exclusivamente en la pretendida culpa precontractual atribuida a FORD MOTOR COMPANY con relación al "contrato de concesión" suscrito en 1999.

Al respecto es importante destacar que dicho contrato se encuentra conformado por una serie de documentos entre los que se encuentran principalmente el "Global Importer Dealer Sales and Service Agreement Standard Provisions", traducido y presentado ante su autoridad por el demandante como "Convenio de Ventas y Servicio del Concesionario Importador Global" y el "Global Importer Dealer Standard Manual", traducido y presentado a su vez por el demandante ante su autoridad como "Concesionario Importador Global Contrato de Ventas y Servicios Disposiciones Generales".

www.scantopdf.eu

Conviene insistir en que los documentos mencionados anteriormente fueron presentados por el demandante que señaló expresamente en el Otrosí 2.- del memorial de demanda: "Acompaño prueba documental, la cual se encuentra en idioma inglés, acompañada de su traducción correspondiente en todos los casos por traductor autorizado, pidiendo que se arrime a sus antecedentes". Por lo cual la autenticidad y validez de dichos documentos ha sido plenamente admitida por el demandante.

4. Existencia de un convenio arbitral

En este sentido, el numeral 14 del "Convenio de Ventas y Servicio del Concesionario Importador Global", establece las reglas a las que se someterá toda disputa emergente entre las partes. En particular, el primer y el último párrafo del mencionado numeral claramente establecen que:

La Compañía y el Concesionario reconocen que podrán suceder controversias que no podrán ser resueltas en el curso normal de los negocios. En el caso de que surja tal controversia, disputa o reclamo entre las partes en conexión con la violación, implementación, invalidez o terminación de este Contrato así como con cualquiera o todos sus anexos, se pondrá en marcha el siguiente procedimiento que constituirá un recurso exclusivo para las partes: ...

7) El Arbitraje al cual las partes se obligan y someten deberá tomar lugar en el Estado de Michigan a menos que sea acordada otra cosa por escrito por ambas partes. La Ley substantiva y procedimental del Estado de Michigan, sin tomar en cuenta el conflicto de normas legales, deberá aplicarse a los procedimientos y las partes acuerdan aceptar tal jurisdicción...

La Compañía y el Concesionario acuerdan que el proceso de resolución de controversias descrita en esta cláusula 14 y que incluye el arbitraje obligatorio, será el mecanismo exclusivo para resolución de cualquier controversia o reclamo entre ambas partes relacionado con la causa o que se relacione de cualquier forma con lo estipulado en este Contrato incluyendo todos sus anexos, su formación, interpretación, implementación, invalidez o terminación." (el subrayado y las negrillas son nuestras)

De la cita anterior se puede evidenciar que queda sometida obligatoriamente a arbitraje toda controversia relacionada al Contrato, incluyendo todo lo relativo a la formación del Contrato. Efectuado un análisis de la demanda se puede concluir que, la demanda presentada se refiere específicamente a la culpa precontractual, es decir a la formación del Contrato, elemento que en virtud a la cláusula arbitral deberá ser sometido ineludiblemente a arbitraje por acuerdo de partes.

5. Normativa aplicable

De acuerdo al parágrafo III del artículo 12° (Excepción de arbitraje) de la Ley de Arbitraje, constatada la existencia del convenio arbitral y sin lugar a recurso alguno, la autoridad judicial competente declarará probada la excepción de arbitraje o,

www.scantopdf.eu

pronunciándose únicamente sobre la nulidad o ejecución imposible del convenio arbitral, desestimará la excepción de arbitraje".

Al respecto, la evaluación de la validez del convenio arbitral, deberá necesariamente partir del presupuesto de que son aplicables al mismo las reglas de los arbitrajes de carácter internacional ya que, de conformidad al artículo 71° (Caracterización) de la Ley de Arbitraje y Conciliación, un arbitraje es de carácter internacional, en los casos siguientes:

1.       Cuando al momento de celebrar el convenio arbitral, las partes tengan sus establecimientos en Estados diferentes.

2.       Cuando el lugar de cumplimiento de una parte sustancial de las obligaciones o el lugar con el cual el objeto de la controversia tenga una relación más estrecha se encuentre fuera del Estado en el que las partes tienen sus establecimientos.

3.       Cuando las partes hubieren convenido expresamente que la materia arbitrable está relacionada con más de un Estado.

Dado que al momento de celebrar el convenio arbitral e incluso a la fecha, las partes (AUTOMOTORES GALINDO S.A y FORD MOTOR COMPANY) tienen sus establecimientos en Estados diferentes (Bolivia y Estados Unidos de Norteamérica), queda claro que la controversia se encuentra sometida las reglas del arbitraje de carácter internacional establecidas por la Ley de Arbitraje y Conciliación.

Como consecuencia de lo anterior: i) Son aplicables a la controversia los convenios internacionales detallados en el artículo (73) de la Ley de Arbitraje y Conciliación; ii) Las disposiciones del Título I de la Ley de Arbitraje y Conciliación relativas al arbitraje en general, se aplicarán con carácter supletorio; iii) El Tribunal Arbitral decidirá la controversia con sujeción a las normas legales elegidas por las partes, como aplicables al fondo de la controversia; iv) La capacidad de las partes para otorgar el convenio arbitral por sí mismas o en representación de otra persona, será la que establezca la ley del lugar de su domicilio, establecimiento principal o residencia habitual, salvo que la ley boliviana sea más favorable a la validez del convenio arbitral; v) La validez sustancial o formal de un convenio arbitral internacional se rige por la ley elegida por las partes.

5. Petitorio

En virtud a los fundamentos de hecho y de derecho precedentemente expuestos, en nombre y representación de mi mandante, solicito respetuosamente a su autoridad que en aplicación del artículo 12 de la Ley de Arbitraje y Conciliación, sin mayor trámite y mediante resolución expresa, declare probada la presente excepción de arbitraje.

Otrosí 1°.- Adjunta Testimonio N° 493/2003.

Otrosí 2°.- En aplicación del Artículo 330 del Código de Procedimiento Civil, solicito que se dé por presentada la prueba que cursa en el expediente con sus

www.scantopdf.eu

Ciento Cuarenta y nueve

respectivas traducciones al idioma Español ofrecida por el demandante, en calidad de prueba documental de la excepción de acuerdo al siguiente detalle:

1) Convenio de Ventas y Servicio del Concesionario Importador Global Provisiones Estánderes y todos sus anexos, incluyendo pero no excluyendo:

   a. Concesionario Importador Global, Contrato de Ventas y Servicios, Disposiciones Generales de la Compañía Ford Motor

   b. Manual de Normas de Concesionario Importador Global de la Compañía Ford Motor.

Otrosi 3º.- Honorarios profesionales de acuerdo a iguala suscrita con la empresa patrocinada.

Otrosi 4º.- Señalo domicilio procesal en el Edifico Pinto Palace Oficina 210.

Justicia

Cochabamba 19 de noviembre de 2003

*Sandra E. Yáñez Eid*
ABOGADO
MATRICULA No 2269
RUC No. 8273103

# N O T A

Presentó ...... Sandra Yanez Eid ............

............................................. C.I. (M. NPI 3027222666.

Fecha 24 - 11 - 03 ...... Hrs. 9:45

Prueba literal testimonio ... fs. ...... 9 ...... doy fé

F 13.

..C. Mercado Hinojosa
AUXILIAR
...do de Partido 7mo. en lo Civil
Cochabamba - Bolivia

www.scantopdf.eu

A, 23 de enero de 2004

TRASLADO.- de la excepción de arbitraje opuesto.- Al Otrosí 1º.-
Arrímese a sus antecedentes.- **Al Otrosí 2do** .- Se tiene presente y
considérese en resolución.- Al Otrosí 3ro.- Se tiene presente.- Al Otrosí
4to.- Por señalado el domicilio procesal que indica.- Notifique funcionario.

**Dr. BASILIO CRUZ CHILO**
JUEZ DE PARTIDO 7º. EN LO CIVIL
Corte Superior de Justicia
COCHABAMBA- BOLIVIA.-

Ma. Zulma Montaño Montaño
SECRETARIA ABOGADA
Juzgado 7mo. de Partido en lo Civil
Cochabamba - Bolivia

www.scantopdf.eu

# EXHIBIT E

Cédula

rep. por Sandra Yañez
c- 06 - IV - 04
Hrs. 09:15

A, 29 de marzo de 2004

VISTOS: La excepción de Arbitraje opuesta por la Empresa Ford Motor Company representada por la Sra. Sandra Yañez Eid.-

CONSIDERANDO: Que, en el contrato de Ventas y Servicios Disposiciones Generales suscrito entre el concesionario Importador Global "Galindo y Cia. Sociedad en Comandita por Acciones y la Compañía Ford Motor Comapny", existe convenio Arbitral instrumentado en el numeral 14 bajo el título Procedimientos de Resolución de Controversias.- que dice: La Compañía y el Concesionario reconocen que podrán suceder controversias que no puedan ser resueltas en el curso normal de los negocios. En el caso de que surja tal controversia, disputa o reclamo entre las partes en conexión con la violación, implementación, invalidez o terminación de este contrato así como con cualquiera o todos sus anexos, se pondrá en marcha el siguiente procedimiento que constituirá un recurso exclusivo para las partes: (a) La Compañía y el concesionario sostendrán una reunión a la brevedad posible, en la que intervengan personas con poder de decisión en cuanto toca a la resolución de la controversia, para tratar de negociar con buena fe una solución a ésta, aunque estableciéndose que ninguna reunión de tal tipo considerará viciar o reducir las obligaciones y responsabilidades de las presentes partes o considerar la renuncia por una de las partes de cualquier solución a la cual tal parte esté de otra manera autorizada a dar.

(b) Si dentro de treinta (30) días posteriores a tal reunión la Compañía y el Concesionario no han tenido éxito en negociar una solución a la controversia, ambos acuerdan llevar la misma a un arbitraje al cual se someten de acuerdo con las Normas de Arbitraje de la Comisión de las Naciones Unidas sobre Derecho Comercial (de aquí en adelante, "UNCITRAL"), y que estén en vigencia a la fecha de suscripción de este Contrato.

(1) La Autoridad nombrada deberá ser la Asociación Americana de Arbitraje.

www.scantopdf.eu

(2) El caso será tratado por la Asociación Americana de Arbitraje de acuerdo con sus "Procedimientos para casos que estén sometidos a las Reglas de Arbitraje de la UNCITRAL".

Que, sobre el tema Arbitral, esta legislado: sobre el convenio en el Art. 10 y sobre la excepción de Arbitraje en el Art. 12 de la Ley No. 1770 de 10 de marzo de 1997 de Arbitraje y Conciliación, cuyo numeral III preceptúa: *"Constatada la existencia del convenio arbitral y sin lugar a recurso alguno, la autoridad judicial competente declarara probada la excepción de arbitraje o, pronunciándose únicamente sobre la nulidad o ejecución imposible del convenio arbitral, desestimara la excepción de arbitraje".*

Que, la Compañia Ford Motor Company, ha terminado con la vigencia del contrato por decisión unilateral; ahora, sobre los daños reclamados por el concesionario que dice ocasionados por ese hecho (de la ruptura unilateral del contrato), resulta imposible llevar ese reclamo a la vía arbitral en ejecución del convenio ante un Tribunal Arbitral del Estado de Michigan Estados Unidos de Norte América, situación imposible que esta prevista su observancia en el Art. 12 -III ultima parte de la Ley citada.

POR TANTO: Se desestima la excepción de arbitraje.- Notifique funcionario.

Dr. BASILIO CRUZ CHILO
JUEZ GE ... O 1°. EN LO CIVIL
Corte Superior de Justicia
COCHABAMBA - BOLIVIA

Fulma Montaño Montaño
SECRETARIA ABOGADA
Juzgado 7mo. de Partido en lo Civil
Cochabamba - Bolivia

www.scantopdf.eu

www.scantopdf.eu

EXHIBIT F



P Rob'

## SEÑOR JUEZ SÉPTIMO DE PARTIDO EN LO CIVIL DEL DISTRITO JUDICIAL DE COCHABAMBA

**Apela y expresa agravios**

**Otrosíes.-**

**SANDRA E. YÁÑEZ EID**, de generales de ley conocidas en representación de la empresa **FORD MOTOR COMPANY**, en virtud al poder contenido en el Testimonio Nº 493/2003 cursante en obrados, dentro de la demanda seguida en su contra por **Automotores Galindo S.A. (GALINDO S.A.)**, expone y pide:

**I.   ANTECEDENTES**

Mediante memorial de 23 de julio de 2002, Galindo S.A. interpuso una demanda por daños  y perjuicios contra **FORD MOTOR COMPANY**. Habiendo sido legalmente notificada por memorial de 19 de noviembre de 2003,  mi representada opuso una excepción de arbitraje, la misma que una vez corrida en traslado fue contestada por Galindo S.A. el 2 de febrero de 2004. Al respecto, el 29 de marzo de 2004, su autoridad dictó resolución desestimando la excepción de arbitraje opuesta por mi representada en el plazo de ley, artículo 12 de La Ley de Conciliación y Arbitraje, concordante con el artículo 336 del Código de Procedimiento Civil el cual determina que Usted se "...inhiba de conocer el caso cuando lo solicite la parte judicialmente demandada." El  6 de abril de 2004 FORD MOTOR COMPANY  fue legalmente notificada con dicha resolución.

Dicha resolución, en su parte final, dice *"...la Compañía Ford Motor Company, ha terminado con la vigencia del contrato por decisión unilateral; ahora, sobre los daños reclamados por el concesionario que dice ocasionados por este hecho (de la ruptura unilateral del contrato), resulta imposible llevar este reclamo a la vía arbitral en ejecución del convenio ante un Tribunal Arbitral del Estado de Michigan Estados Unidos de Norteamérica: situación imposible que está prevista su observancia en el Art 12- III última parte de la ley citada* (Nota: El juez se refiere a la Ley de conciliación y arbitraje) *POR TANTO.- Se desestima la excepción de arbitraje...".*

En consecuencia, de acuerdo a los antecedentes planteados, a nombre de mi representada, FORD MOTOR COMPANY, habiendo sufrido agravios, dentro del término legal, me permito recurrir de apelación contra la mencionada Resolución dictada por su autoridad el 29 de marzo de 2004, de acuerdo a los siguientes términos:

**II.   INCUESTIONABILIDAD DE EXISTENCIA DE CONVENIO ARBITRAL**

De acuerdo a lo señalado en el memorial por el que se opuso la excepción de arbitraje en aplicación del Art. 12 de la Ley 1770, ("El convenio arbitral importa la renuncia de las partes a iniciar proceso judicial sobre las materias o controversias sometidas al arbitraje") el primer y último párrafos del numeral 14 del "Convenio de Ventas y Servicio del Concesionario Importador Global", firmado entre FORD MOTOR COMPANY y GALINDO

www.scantopdf.eu

*tuvo que asumir Galindo S.A.* antes de suscribir el contrato el año 1999" (resaltado nuestro).

En vista de lo anterior, debemos concluir que su autoridad ha declarado la imposibilidad de ejecutar el convenio arbitral basada en que el contrato ya se había extinguido. Esto es además respaldado por el hecho de que la Resolución dictada por su autoridad el 29 de marzo de 2004 menciona expresamente en su parte final que *"...la Compañía Ford Motor Company, ha terminado con la vigencia del contrato por decisión unilateral; ahora, sobre los daños reclamados por el concesionario que dice ocasionados por este hecho (de la ruptura unilateral del contrato), resulta imposible llevar este reclamo a la vía arbitral en ejecución del convenio ante un Tribunal Arbitral del Estado de Michigan Estados Unidos de Norteamérica: situación imposible que está prevista su observancia en el Art 12- III última parte de la ley citada POR TANTO.- Se desestima la excepción de arbitraje...".* (subrayado y resaltado nuestro).

### III.    EJECUTABILIDAD DEL CONVENIO ARBITRAL

Contrariamente a lo afirmado por su autoridad la ejecución del citado Convenio arbitral es absolutamente posible por lo siguiente:

a) **El derecho puede sujetarse a arbitraje.** El Art. 3 de la Ley 1770 señala que pueden someterse a arbitraje *"las controversias surgidas o que puedan surgir de relaciones jurídicas contractuales o extracontratuales de las partes...sobre derechos disponibles y que no afecten al orden público".* En ningún caso el Convenio arbitral contenido en el contrato de 1999 versa sobre derechos no susceptibles de disposición o que afecten el orden público, y tampoco se refiere a materias que expresamente son excluidas por la ley del arbitraje (Art. 6 Ley 1770).

b) **Existe la voluntad expresa de las partes de someter sus controversias a arbitraje.** Ambas partes tienen suficiente capacidad jurídica como para someterse a arbitraje en ejercicio de su libre arbitrio. Y de hecho las partes han expresado su voluntad expresa de someterse a arbitraje a través de una cláusula que señala textualmente su voluntad de someter a arbitraje, *"cualquier controversia o reclamo entre ambas partes relacionado con la causa o que se relacione de cualquier forma con lo estipulado en este Contrato incluyendo todos sus anexos, su formación..."* Es indiscutible que la cláusula arbitral se debe aplicar a cualquier controversia relacionada a la causa o a la formación del contrato. Además, las partes han determinado libremente el lugar del arbitraje, la norma aplicable, etc aspectos todos perfectamente factibles de ejecución.

Es decir que el convenio arbitral ha cumplido con todos lo requisitos legales para su validez y ejecución. No es de ejecución imposible.

### IV.    APLICACIÓN DE LA EXCEPCIÓN DE ARBITRAJE

Pero la excepción de arbitraje ¿es aplicable a un contrato terminado?

www.scantopdf.eu

El Art. 11 de la Ley 1770 señala textualmente *"(Autonomía del convenio arbitral). Todo convenio arbitral que forme parte de un contrato principal se considera como un acuerdo independiente de las demás estipulaciones del mismo"*. En efecto, la cláusula que contiene el convenio arbitral, comúnmente denominada "cláusula arbitral", debe considerarse como un contrato distinto y que no depende del contrato que formalmente lo contiene. Por tanto, la terminación del contrato de ninguna manera significa la terminación del convenio arbitral. El convenio arbitral es plenamente aplicable. Más aun si explícitamente el convenio arbitral cubre el periodo de formación o las causas del contrato principal.

Por otro lado, la terminación del contrato en modo alguno significa la inaplicabilidad del convenio arbitral porque justamente el demandante reclama una "culpa pre-CONTRACTUAL" y su demanda está íntimamente ligada a la existencia de un contrato principal.

Al respecto, de acuerdo al artículo 465 del Código Civil *"(CULPA PRECONTRACTUAL). En los tratos preliminares y en la formación del contrato las partes deben conducirse conforme a la buena fe, debiendo resarcir el daño que ocasionen por negligencia, imprudencia u omisión en advertir las causales que invaliden el contrato"*. (subrayado y negrillas nuestros).

En la demanda GALINDO S.A. argumenta que Ford Motor Company supuestamente *"omitió advertir, mencionar o señalar cuáles podrían ser las causas de extinción del contrato principal, con lo que logró que Galindo S.A. efectúe inversiones considerables que a la fecha resultan improductivos, consiguientemente no se condujo con las reglas de la buena fe e incurrió en abuso de derecho, lo que al tenor del artículo 984 del Código Civil, conlleva una responsabilidad de resarcimiento de daños"*.

El supuesto hecho culposo al que GALINDO atribuye los supuestos daños que sufrió es indisoluble del contrato de 1999. Sin ese contrato no existe supuesto hecho culposo y por tanto no puede existir daño.

Sin embargo, el convenio arbitral ¿es aplicable al periodo pre-contractual?

El convenio arbitral por el que procede la excepción de arbitraje indica claramente que se debe aplicar a cualquier controversia relacionada con la causa de este contrato, su formación, etc. GALINDO específicamente reclama culpa precontractual, que como vimos, de acuerdo al artículo 465 del código Civil se refiere a la formación del contrato, por otra parte ha indicado que realizó las inversiones que hoy reclama improductivas a fin de firmar el contrato principal, en sus propias palabras *"...a las inversiones y sujeción a planes de la FORD que tuvo que asumir Galindo S.A. antes de suscribir el contrato el año 1999"* (memorial de respuesta a excepción arbitral), es decir que estaba preparándose para el contrato, la razón de ser de dichas inversiones era el contrato, es decir que estaba preparando, FORMANDO los requisitos necesarios; es decir que el

www.scantopdf.eu

contrato estaba en formación. Justamente, en virtud al Art. 452 del Código Civil las partes trabajaban sobre el objeto y la causa imprescindibles para la coincidencia de voluntades (consentimiento) que finalmente dio lugar al contrato. Las partes se prenaraban para el contrato, formaban sus elementos esenciales. El contrato estaba en formación. "

## V.   PETITORIO

Por tanto, en virtud de lo expuesto, en aplicación del convenio arbitral contenido en el "Convenio de Ventas y Servicio del Concesionario Importador Global", firmado entre FORD MOTOR COMPANY y GALINDO S.A. y en ejecución de los artículos citados de la Ley 1770 de Conciliación y Arbitraje, del Código Civil y el Código de Procedimiento Civil, a nombre de mi representada, **INTERPONGO RECURSO DE APELACIÓN** contra la Resolución dictada por su autoridad en el presente proceso el 29 de marzo de 2004 por causarme agravios, y solicito su consiguiente remisión al tribunal de alzada, a fin de que el mismo lo **REVOQUE** totalmente, y sean previas las formalidades de ley.

Otrosí.- Se comisione a funcionario público

Cochabamba, 8 de abril de 2004

Sandra E. Yáñez Eid
A B O G A D O
Carnet Nacional C - 5737
RUC No. 8273103

## N O T A

Presentó ...Sandra.....E....Yanez..............
............................................. C.I. 30.27.222. cbha .
Fecha ..12 - 0.4 . 0.4............ Hrs. 15:40 .
Prueba literal Fscrala | C... fs. ....1...........: doy fé
         apelacion .
         F 13.

30272.22 Cb6a .

Raminada Calani Matos
AUXILIAR
Juzgado de Partido
7mo. en lo Civil y Comercial
Cochabamba - Bolivia

www.scantopdf.eu



13 de abril de 2004

Dr. BASILIO CRUZ CRILO
JUEZ 8o. ... EN LO CIVIL
... orgánio de Justicia
COCHABAMBA - BOLIVIA

SECRETARIA ABOGADA
Juzgado 3ro. de Partido en lo Civil
Cochabamba - Bolivia

Produced with scantopdf.eu

www.scantopdf.eu

www.scantopdf.eu

EXHIBIT G

**26 de mayo de 2.006**

**VISTOS:** En apelación el auto de fecha 29 de marzo de 2.004 dictado por el Juez de Partido Séptimo en lo Civil de la Capital, dentro el proceso **ordinario** seguido por Enrique Galindo Huerta representante legal de **Galindo S.A.** contra **Ford Motor Company** representado por Sandra Yañez Eid; los antecedentes, y

**CONSIDERANDO:** Contra el auto de 29 de marzo de 2.004 que rechaza la excepción de arbitraje, Sandra Yañez Eid en representación de Ford Motor Company interpone recurso de apelación, recurso éste que será considerado por este Tribunal dentro el marco previsto por el artículo 236 del Código de Procedimiento Civil.

**CONSIDERANDO:** Si bien es cierto que nuestro ordenamiento jurídico prevé los recursos ordinarios e incluso extraordinarios por los que cualquiera de las partes en litigio puedan reclamar sus derechos que hubieran sido conculcados, recursos éstos que también se encuentran establecidos en el artículo 8 de la Declaración Universal de los Derechos Humanos y artículo 8 inc. 2-h) del Pacto de San José de Costa Rica; empero, éstos recursos también deben ser claramente establecidos en las normas en vigencia.

Conforme el parágrafo III del artículo 12 de la Ley 1770 claramente dice: "...constatada la existencia del convenio arbitral **sin lugar a recurso alguno**, la autoridad judicial competente declarará probada la excepción de arbitraje o, pronunciándose únicamente sobre la nulidad o ejecución imposible del convenio arbitral, desestimará la excepción de arbitraje..."; en el caso habiendo sido desestimada la excepción de arbitraje, la Empresa Ford Motor Company interpone recurso de apelación, recurso éste que fue concedido en forma indebida por el a-quo, en franco desconocimiento de la disposición legal transcrita que es de cumplimiento obligatorio por ser de órden público tal como preceptúa el artículo 90 del Procedimiento Civil. Al respecto el Tribunal Supremo ha sentado la siguiente jurisprudencia que señala: "...cuando la autoridad judicial constata la existencia del convenio arbitral, debe declarar probada la excepción de arbitraje, mediante resolución expresa que no admite recurso alguno, conforme al artículo 12-III de la citada Ley Especial de aplicación preferente, por mandato del artículo 5 de la Ley de Organización Judicial. Que, por las razones expuestas, en el caso presente, no correspondían interponerse y menos concederse los recursos tanto de apelación como de casación..." (A.S. Nº 78 de 11 de abril de 2.005).

Consiguientemente, no se encuentra abierta la competencia de este Tribunal para conocer el recurso de fs. 167-169.

**POR TANTO:** La Sala Civil Segunda de la Corte Superior de Justicia ANULA el auto de concesión de alzada de 24 de mayo de

2.004 complementada por auto de 9 de julio de 2.004 y se declara ejecutoriado el auto de 29 de marzo de 2.004. Notifique funcionario.

Regístrese.

Vocal relatora: Dra. Virginia Rocabado Ayaviri.

*[firma]*
Dra. Virginia Rocabado Ayaviri
VOCAL DE LA SALA CIVIL II
CORTE SUPERIOR DE JUSTICIA
Cochabamba - Bolivia

*[firma]*
Dra. María del Carmen Ponce de Rocha
PRESIDENTA
CORTE SUPERIOR DE JUSTICIA
Cochabamba - Bolivia

*[firma]*
Rafael Padilla Amezlay
SECRETARIO DE CÁMARA DE LA SALA CIVIL II
Corte Superior de Justicia
Cochabamba - Bolivia

En Cochabamba, a los __09__ días del mes de ___junio___ de __2006__ a horas __18.00__ notifique con el _Auto de Vista_ de 26 de mayo de 2006 que antecede a _Sandra Le Yañez, Eid por la Empresa Motor Company_ fijando copia de ley en el tablero de la _Sala Civil Segunda, en presencia de quien suscribe. Doy fe._

*[firma]*
_Pabla Duran_
_[firma] C.I. 5242133_

*[firma]*
Jhazmany J. Zenteno Valdéz
OFICIAL DE DILIGENCIAS SALA CIVIL II
Corte Superior de Justicia
Cochabamba - Bolivia

En Cochabamba, a los __09__ días del mes de ___junio___ de __2006__ a horas __18.00__ notifique con el _Auto de Vista_ de 26 de mayo de 2006 que antecede a _Enrique Salinas Huerta por Salinas S.A._ fijando copia de ley en el tablero de la _Sala Civil Segunda, en presencia de quien suscribe. Doy fe._

*[firma]*
Jhazmany J. Zenteno Valdéz
OFICIAL DE DILIGENCIAS SALA CIVIL II
Corte Superior de Justicia
Cochabamba - Bolivia

*[firma]*
_C.I. 4412785 SSa_

Vacación Judicial del ___ de ___ de 20__ al ___ de ___ de 20__. Doy fe

*[firma]*
Moyra Vargas Rejas
AUXILIAR
JUZGADO DE PARTIDO 7mo EN LO CIVIL
DE LA CAPITAL
COCHABAMBA - BOLIVIA

# EXHIBIT H

SEÑORES VOCALES DE LA CORTE SUPERIOR DE DISTRITO JUDICIAL DE COCHABAMBA.

> INTERPONE AMPARO CONSTITUCIONAL
> CONTRA LOS VOCALES DE LA SALA CIVIL
> SEGUNDA DEL DISTRITO JUDICIAL DE
> COCHABAMBA y el señor JUEZ 7° DE
> PARTIDO EN LO CIVIL y pide.
>
> OTROSÍES. Su contenido.

PRIMITIVO GUTIÉRREZ SÁNCHEZ, de profesión Abogado, Matrícula Nacional No. 02835 del Colegio Nacional de Abogados de Bolivia, C. I. No. 497504L.P. (con domicilio permanente en la ciudad de Santa Cruz de la Sierra, Radial Castilla No. 12-B, del Barrio Las Palmas) y domicilio eventual en la calle Sucre No. 780 Edf. Arandia, piso 2° oficina 2-B, apoderado de la empresa: **FORD MOTOR COMPANY** (en lo posterior del presente recurso simplemente: "**FORD**") una corporación constituida bajo las leyes del Estado de Delaware de los Estados Unidos de Norteamérica, en virtud del poder especial y suficiente No. 493/2003 expedido ante la Notaría de Tatiana Terán de Velasco del Distrito Judicial de La Paz (que se adjunta, ante las consideraciones de R. Tribunal Superior, con todo respeto se presenta, expone y pide:

I.     **PERSONERÍA DE LA PARTE RECURRENTE.**

En virtud al Poder No.493/2003 de fecha 11 de noviembre de 2003, expedido por la señora Notario de Fe Pública No. 061, Dra. Tatiana Terán de Velasco, me apersono ante el R. Tribunal Superior en nombre y representación legal de la corporación **FORD MOTOR COMPANY** de USA y pido que se me hagan conocer las diligencias posteriores inherentes al presente recurso de Amparo Constitucional, en aplicación del inciso I del Art. 97° de la Ley del Tribunal Constitucional No. 1836 de fecha 1 de abril de 1998.

II.    **AUTORIDADES RECURRIDAS.**

El presente Amparo Constitucional se dirige contra los señores vocales de la Sala Civil Segunda de la **Corte Superior de Distrito Judicial de Cochabamba: Dras. Maria del Carmen Ponce de la Rocha, Dra. Virginia Rocabado Ayaviri,** en lo sucesivo del presente recurso serán nombrados como las

1

www.scantopdf.eu

señoras "MAGISTRADOS" y el señor **Juez de Partido 7° en lo Civil de Cochabamba, Dr. Basilio Cruz Chilo** (en lo posterior el JUEZ AD-QUO), domiciliados en el Edificio de la Corte Superior del Distrito Judicial de Cochabamba y los diferentes juzgados, ubicados sobre la calle San Martín esquina Jordán, respectivamente.

III.    **ANTECEDENTES DE NATURALEZA PROCESAL.**

i)      En fecha **2 de agosto de 2002**, la sociedad GALINDO S.A., ha interpuesto una demanda ordinaria sobre resarcimiento de daños y perjuicios contra la empresa norteamericana **FORD MOTOR COMPANY**, en la persona del señor William Clay Ford, con domicilio en The American Road , Dearborn Michigan 48121-1899 de los Estados Unidos de Norteamérica.

ii)     En fecha 14 de noviembre de 2003 y a través del memorial de fojas 147-149 la corporación **FORD MOTOR COMPANY** mediante la apoderada: Dra. Sandrá Yañez Eid, ha opuesto **excepción de arbitraje** contra la pretensión de la sociedad GALINDO S.A.

iii)    Mediante Resolución de fecha 29 de marzo de 2004 (fs. 165 de obrados) el Juez **AD-QUO, ha desestimado la excepción de arbitraje.**

iv)     En fecha  12 de abril de 2004 la corporación FORD ha deducido recurso de apelación contra la resolución del Juez **AD-QUO,** de manera que con la respuesta de la parte demandante, a través del Auto de fecha 24 de mayo de 2004 (fs.172 vta), se  ha concedido el recurso de alzada y remitido obrados a conocimiento del Tribunal Superior.

v)      En fecha 26 de mayo de 2006, la **SALA CIVIL II de la Corte Superior del Distrito Judicial de Cochabamba,** ha emitido el Auto de Vista por el que **anula** el auto de concesión del recurso de apelación de fs. 172 vta de fecha 24 de mayo de 2004 y complementado en fecha 9 de julio de 2004 y se declara **ejecutoriado** el Auto de fecha 29 de marzo de 2004 (fs. 165 de obrados).

Decisiones que motivan el presente recurso de amparo constitucional.

IV.     **FUNDAMENTOS DE LA DESESTIMACIÓN DE LA EXCEPCIÓN DE ARBITRAJE.**

Resulta también de suyo importante, señores Magistrados del Tribunal de Amparo, puntualizar los fundamentos de la desestimación **de la excepción de arbitraje** tanto del Juez AD-QUO como de la Sala Civil II de la Corte Superior del Distrito Judicial de Cochabamba:

a)      **Fundamentos de la decisión del Juez Ad-quo.**

2

www.scantopdf.eu

www.scantopdf.eu

El fundamento del señor Juez AD- QUO para desestimar la excepción de arbitraje es que: al haber terminado unilateralmente el contrato la corporación FORD, resulta imposible llevar el reclamo a la vía arbitral en ejecución del convenio, como esta previsto en el numeral III del Art. 12° de la Ley No. 1770; de forma textual, indica: *"Que la compañía Ford Motor Company. ha terminado con la vigencia del contrato por decisión unilateral; ahora, sobre los daños reclamados por el concesionario que dice ocasionados por ese hecho (de la ruptura unilateral del contrato) resulta imposible llevar ese reclamo a la vía arbitral en ejecución del convenio ante un Tribunal Arbitral del Estado de Michigan Estados de Norteamérica, situación imposible que está prevista su observancia en el Art. 12- III, última parte de la ley citada".*

El Juez AD-QUO, señores Magistrados del Tribunal de Amparo, ha ignorado o enervado la previsión del Art. 11° de la Ley No. 1770, que consagra: *"Art. 11° (Autonomía del convenio arbitral). Todo convenio arbitral que forme parte de un contrato principal se considera como un acuerdo **independiente de las demas estipulaciones del mismo".*** Por lo que la terminación unilateral de la corporación FORD, no ha afectado en modo alguno a la cláusula arbitral. Es más, la demandante GALINDO S.A. ha presentado en calidad de prueba literal y traducido al español el documento complementario al Contrato de 1999 denominado: ***"Convenio de Ventas y Servicios del Concesionario Importador Global"*** en cuyo numeral 14, la parte pertinente, dispone: *"La Compañía y el Concesionario <u>reconocen que podrán suceder controversias que no podrán ser resueltas en el curso normal de los negocios. En el caso de que surja tal controversia, disputa o reclamo entre las partes en conexión con la violación, implementación, invalidez o **TERMINACIÓN DE ESTE CONTRATO** así como con cualquiera o todos sus anexos, se pondrá en marcha el siguiente procedimiento que constituirá un recurso exclusivo para las partes. ...7) El **ARBITRAJE** ...(sic) ...".*</u>

De manera que, señores Magistrados del Tribunal de Amparo, la terminación unilateral del contrato no afecta en modo alguno a la cláusula arbitral y tampoco implica un acto imposible de ejecución; más aún, al haberse previsto expresamente la aplicación del convenio arbitral AÚN EN EL CASO de TERMINACIÓN del CONTRATO, como determina el numeral 14 del ***"Convenio de Ventas y Servicios del Concesionario Importador Global"*** anexo al Contrato

3

Principal de 1999. Por lo que la decisión del Juez AD-QUO importa la trasgresión o violación del Art. 11° de la Ley de Arbitraje y Conciliación No. 1770 y el desconocimiento del numeral 14 del Convenio mencionado, amparado en la autonomía de la voluntad así normada por el Art. 454° del Código Civil.

b) **Fundamento de la decisión de la Sala Civil II (Tribunal Ad-quem).**

El Tribunal Ad-quem en la parte considerativa del Auto de Vista de fecha 26 de mayo de 2006 apoya su decisión en el párrafo III del Art. 12° de la Ley de Arbitraje y Conciliación No. 1770, por el que ya sea que: i) declare probada la excepción de arbitraje, o ii) desestime la excepción de arbitraje, es SIN LUGAR A RECURSO ALGUNO. Por ello, anula el auto de concesión del recurso de apelación y declara **ejecutoriada** la resolución del Juez AD-QUO de 29 de marzo de 2004. Respalda la decisión también en el Auto Supremo No. 78 de 11 de abril de 2005.

Indudablemente, no corresponde el recurso de apelación por disposición del citado párrafo II del Art. 12° de la Ley No. 1770.

Lo anterior implica que: tanto la trasgresión o violación del Art. 11° de la propia Ley No. 1770 en que ha incurrido el Juez AD-QUO así como el desconocimiento del numeral 14° del *"Convenio de Ventas y Servicios del Concesionario Importador Global"* anexo al contrato principal de 1999, fundados en la autonomía de la voluntad (Art. 454° del Código Civil) DEBEN QUEDAR SIN LA OPCIÓN DE IMPUGNACIÓN POR NINGÚN MEDIO O RECURSO?. Al haberse cerrado o toda posibilidad de reclamación o impugnación, queda abierto el amparo constitucional en resguardo de los derechos fundamentales de las personas y que han sido lesionados, motivo del presente recurso.

V. **GARANTIAS CONSTITUCIONES ESPECIFICAS LESIONADAS CON LAS DECISIONES DEL TRIBUNAL AD-QUEM y AD-QUO, RECURRIDOS.**

El Tribunal Ad-quem al anular el auto de concesión de alzada y declarar ejecutoriada la resolución de fojas. 165 de fecha 29 de marzo de 2004 (emitida por el Juez AD-QUO) ha cortado toda posibilidad de reclamación por la vía jurisdiccional procedimental o procesal.

El Juez AD-QUO al desestimar la excepción de arbitraje de manera equívoca o vulneratoria del Art. 11° de la Ley 1770, sin la posibilidad de recurso alguno, HA DEJADO SIN LUGAR A

4

www.scantopdf.eu

www.scantopdf.eu

DEFENSA de la empresa **FORD** de NINGUNA NATURALEZA PROCEDIMENTAL O PROCESAL JURISDICCIONAL.

Por lo tanto, no queda otra opción, señores Magistrados del Tribunal de Amparo, que la empresa **FORD** recurra al recurso de amparo constitucional en resguardo de sus derechos fundamentales que han sido lesionados, de modo que se restablezcan los mismos.

A continuación se exponen los derechos constitucionales lesionados:

1° **Inviolabilidad del derecho de defensa en juicio de toda persona.**

El derecho de las persona naturales o jurídicas a la defensa en juicio constituye una garantía constitucional que los operadores de justicia están impelidos a su cumplimiento; sin embargo, tanto el Tribunal Ad-quem al anular el auto de concesión de apelación y declarar ejecutoriada la decisión del Juez Ad-quo de 29 de marzo de 2004, ha cercenado o cortado el mencionado derecho de defensa ya sea por la vía de reclamo o impugnación judicial.

El Juez AD-QUO al desestimar la excepción de arbitraje opuesta por la corporación FORD amparada en la autonomía de la voluntad, el Art. 11° de la Ley No. 1770 y el numeral 14° del *"Convenio de Ventas y Servicios del Concesionario Importador Global",* ha conculcado el derecho de defensa de la corporación **FORD**, debido a la prohibición expresa del recurso de apelación contra la decisión de la autoridad judicial de primera instancia.

Más aún, señores Magistrados del Tribunal de Amparo, la *ejecución imposible del convenio arbitral,* así previsto en la parte última del párrafo III del Art. 12° de la Ley No. 1770, hace referencia exclusiva y limitada a la cláusula o convenio arbitral y de NINGUNA MANERA A LA EJECUCION DEL CONTRATO PRINCIPAL, como en forma totalmente errada y violatoria ha interpretado el Juez AD-QUO. Vale decir, si la cláusula arbitral en su contenido expresará condicionamientos imposibles de cumplir, verbigracia: que el tribunal este compuesto por 100 árbitros o que sean nombrados los árbitros por una entidad inexistente, etc., importa una imposibilidad de cumplimiento o ejecución.

2° **La autonomía de la voluntad de las personas.**

El párrafo II del Art. 6° de la Constitución Política del Estado garantiza a toda persona la personalidad y capacidad jurídica con arreglo a las leyes. El art. 454° del Código Civil

5

consagra la libertad contractual de las personas para **crear, modificar o extinguir derechos y obligaciones contractuales** (civiles o comerciales) con la limitación de que evite alterar las leyes expresas.

Conforme señala Morales Guillén (Código Civil, concordado y anotado, pág 319), el principio de la Autonomía de la Voluntad, regulado por el artículo 454 citado, se resume en tres postulados: *"1). Los individuos son libres de contratar y discutir , en pie de igualdad, las condiciones; determinar el contenido de su objeto; combinar los tipos de contratos previstos por la ley o inventar otros completamente nuevos; 2) Pueden elegir la legislación más conveniente a su relación jurídica o descartar la aplicación de toda ley de carácter supletorio; 3) se desconocer las formas rituales y las formas solemnes son excepcionales; 4) los efectos de los contratos, son los que las partes han querido darle y las reglas de interpretación no asignan al juzgador la facultad de hacer prevalecer su criterio, sino la intención de las partes".*

El Art. 11° de la Ley No. 1770 reconoce la independencia de la cláusula arbitral con referencia al contrato principal. El convenio arbitral implica la renuncia de las partes al proceso judicial (párrafo I del Art. 12° de la Ley 1770). La renuncia al arbitraje solo procede, también por voluntad de las partes necesariamente (art. 13° de la Ley 1770).

El Juez AD-QUO, desestimar la excepción de arbitraje de forma errada, ha conculcado el derecho fundamental de la personas jurídicas: **FORD** y **GANLIDO S.A.**, a someter sus controversias de la naturaleza que fueren y aún después de terminada la relación contractual, por la vía arbitral y en virtud de la autonomía de la voluntad, como garantiza el párrafo I del Art.6° de la C.P.E., y queda reiterada o ratificada por el **Art. 454°** del Código Civil y los Arts. 11°, 12°-I y 13° de la Ley No. 1770. El operador de justicia no puede suplir la voluntad de las partes que determinen una forma de solucionar sus controversias, aún se traten de procesos de nulidad.

3°     **La ausencia de seguridad jurídica en la decisión del Juez AD-QUO.**

El Art. 35° de la Constitución Política del Estado garantiza que aquellos principios y garantías fundamentales de las personas, como la referida a la *"seguridad jurídica"* se hallan también incorporadas por amplitud e implícitamente como derechos fundamentales de las personas.

6

El principio de *"seguridad jurídica"*, a decir Manuel Ossorio, es una "condición esencial para la vida y el desenvolvimiento de las naciones y de los individuos que la integran". Esta garantía *"representa la garantía de la aplicación objetiva de la ley, de tal modo que los individuos saben en cada momento cuáles son sus derechos y sus obligaciones"*, sin que el capricho o la torpeza de las autoridades puedan causarles perjuicio. El principio de seguridad jurídica, se encuentra vigente en todo "Estado de Derecho".

Las partes han resuelto que las controversias -aún en el caso de terminación del contrato- sean resueltas por un Tribunal Arbitral; al desestimar la excepción de arbitraje, el Juez AD-QUO se ha declarado con competencia en contra de la autonomía de la voluntad de las partes que han decidido renunciar al proceso judicial (como determina el párrafo I del Art. 12º de la Ley No. 1770) para resolver la controversia suscitada entre FORD MOTOR COMPANY y la sociedad GALINDO S.A., de manera que ha incurrido en la violación de la garantía constitucional del Art. 31º de la Constitución Política del Estado que consagra que son nulos los actos de quienes usurpen jurisdicción y competencia que no emane de la ley. Acto que importa una agravante a la garantía inherente a la **seguridad jurídica** que se halla obligado a resguardar el servidor público.

De manera que, el Juez AD-QUO ha conculcado la garantía constitucional de la **seguridad jurídica** al desestimar la excepción de arbitraje mediante una apreciación del párrafo III parte final del Art. 12º de la Ley 1770 en forma totalmente errónea y violatoria de los Arts. 11º, 12º-I y 13º de la propia Ley No. 1770. La trasgresión de las normas legales indicadas, importa una *inseguridad jurídica* para la persona jurídica: **FORD**, más aún, al haberse suscrito el contrato principal y los anexos fuera del territorio boliviano y sujeta a las leyes del Estado de Michigan de los Estados Unidos de Norteamérica. Por lo que la cláusula arbitraje internacional, resulta totalmente ajena a las normas sustantivas de nuestro país, y fundada en la voluntad o autonomía de las partes. De manera que la *inseguridad jurídica* provocada por la decisión del Juez AD-QUO tiene aún mayor significación en el concierto de los países fuera del territorio boliviano.

VI.   **PETICIÓN.**

En mérito de la exposición relatada y los fundamentos jurídicos que denotan la violación de los

7

www.scantopdf.eu

www.scantopdf.eu

derechos y garantías constitucionales incurridas tanto por parte de los señores VOCALES de la Sala Civil II de la Corte Superior del Distrito Judicial de Cochabamba: **Dras. María del Carmen Ponce de la Rocha, Dra. Virginia Rocabado Ayaviri** y el señor **Juez de Partido 7° en lo Civil: Dr. Basilio Cruz Chilo**, en nombre y representación legal de la persona jurídica **FORD MOTOR COMPANY (FORD)** solicito al Respetable Tribunal de Amparo, en aplicación de los articulo citados y mencionados en este memorial, se declare **Procedente y haber lugar al amparo constitucional** y como consecuencia de ello, se disponga i) se deje sin efecto legal o declare inaplicable la declaración de ejecutoria del auto de 29 de marzo de 2004 contenida en la parte final del Auto de Vista de fs. 194 de fecha 26 de mayo de 2006; y, ii) se determine que el Juez AD-QUO de cumplimiento al párrafo III del Art. 12° de la Ley de Arbitraje y Conciliación No. 1770 declarando **probada la excepción de arbitraje** opuesta por la corporación FORD MOTOR COMPANY con la remisión de obrados a conocimiento del Tribunal Arbitral convenido por las partes, con la imposición de costas.

**OTROSÍ 1°** Se ordene la citación a los distinguidos señores Vocales de la Sala Civil II de la Corte Superior del Distrito Judicial de Cochabamba así como al señor Juez de Partido 7° en lo Civil, cuyos datos se detallan en el inicio de éste memorial.

**OTROSÍ 2°** Las SC 1351/2003-R, 814/2006-R y el AC 282/2006-RCA establecen como requisito la citación a Terceros Interesados, para el caso de que el amparo, emerja de un proceso judicial o administrativo. Por tanto, en amparo de las normas mencionadas, solicitamos al Tribunal de Amparo disponga la citación personal o por Cédula de los terceros interesados: la sociedad GALINDO S.A., en la persona del señor Enrique Galindo Huerta, C.I.No. 972871, con domicilio en la calle Libertador Bolívar No. 1416 de esta ciudad.

**OTROSÍ 3°** Se adjunta la prueba documental, consistente en los siguientes documentos:

-   Memorial de Demanda presentado por GALINDO S.A.
-   Memorial de excepción de arbitraje de FORD MOTOR COMPANY.
-   Resolución del Juez Ad-quo de 29 de marzo de 2004.
-   Auto de Vista de fs. 194 de fecha 26 de mayo de 2006.
-   Poder Especial y suficiente No.493/2003.

**OTROSÍ 4°** Los abogados patrocinantes anuncian la existencia de iguala profesional con el organismo

8

www.scantopdf.eu

internacional representado.

OTROSÍ 5° Domicilio procesal: la Secretaría de Cámara.

Justicia, Cochabamba, 8 de diciembre de 2006

9

EXHIBIT I

*cbbe/ 06/02/2007*

*hrs: 11:05 A*



**PODER JUDICIAL DE LA NACIÓN**
**CORTE SUPERIOR DE JUSTICIA COCHABAMBA**
**SALA PENAL TERCERA**

Recurso: Amparo Constitucional
P. Demandante: FORD MOTOR COMPANY
Querellado: Sala Civil Segunda y Juez 7° de Partido en lo Civil

### Cochabamba, 2 de febrero de 2.007

**VISTOS:** El Recurso de Amparo Constitucional interpuesto en fecha 09 de diciembre de 2006 por Primitivo Gutierrez Sanchez, en representación de FORD MOTOR COMPANY, contra los Dres. Basilio Cruz Chilo, Maria del Carmen Ponce de Rocha y Virginia Rocabado Ayaviri, Juez de Partido 7° en materia Civil de esta Capital, el primero, y Vocales de la Sala Civil Segunda, las dos últimas, sus antecedentes, lo expuesto en audiencia; y,

**CONSIDERANDO II:** Conforme dispone el art. 19 de la Constitución Política del Estado concordante con el art. 94 de la Ley No. 1836: "Procederá el recurso de Amparo Constitucional contra toda resolución, acto u omisión indebida de autoridad o funcionario, siempre que no hubiere otro medio o recurso para la protección inmediata de los derechos y garantías, así como contra todo acto u omisión indebida de persona o grupo de personas particulares que restrinjan, supriman o amenacen restringir o suprimir los derechos o garantías reconocidos por la Constitución Política del Estado y las Leyes".

**CONSIDERANDO:** Verificados los requisitos de forma que debe contener todo recurso de amparo constitucional, conforme manda el art. 97 de la Ley del Tribunal Constitucional, se establece que el amparo solicitado por Primitivo Gutierrez Sanchez, en representación de FORD MOTOR COMPANY, no acredita suficientemente la personería del recurrente; como se fundamenta en el análisis que sigue a continuación:

I. Todas las personas comprendidas en el art. 5 del Código de Comercio, se encuentran obligadas a acreditar ante la autoridad jurisdiccional su matrícula del Registro de Comercio, conforme señala el art. 33 del mismo cuerpo legal, que prescribe: *"Los jueces ante quienes ocurren los comerciantes deben exigir a éstos que acrediten previamente su matrícula del Registro de Comercio"*; asimismo, y de manera concordante, el art. 165 del Código de Comercio, establece: *"La designación y cesación de administradores y representantes deben inscribirse en el registro de Comercio con indicación expresa de las facultades otorgadas en la escritura de constitución o en el Poder conferido ante Notario de Fe Pública. La falta de inscripción no perjudica a terceros"*; lo que significa que la empresa recurrente debe acreditar no sólo la matrícula de la empresa inscrita en el Registro de Comercio, sino también la designación del representante legal que participa en la interposición del presente recurso de amparo constitucional inscrita en ese registro, en aplicación de los arts. 27 y 29 del repetido cuerpo de leyes.

2

Si bien es cierto que el instrumento de poder adjunto, de fs. 17 a fs. 25, cumple con el requisito de validez previsto en el art. 1309 del Código Civil, porque es fotocopia del original, legalizada por la funcionaria que es la depositaria legal de ese documento, Dra. Tatiana Terán de Velasco, Notario Público N° 61 de la ciudad de la La Paz; sin embargo, no acredita la matrícula del Registro de Comercio de FORD MOTOR COMPANY y tampoco el registro de designación de su representante legal, pues, aunque en la fotocopia legalizada aparece el sello marginal de la oficina del Registro de Comercio, éste carece de valor legal porque no esta legalizado por el funcionario que tiene a su cargo el Registro de Comercio.

Si bien es cierto que la empresa FORD MOTOR COMPANY tiene sede en Estados Unidos de Norteamérica; sin embargo, esta situación no exime a su representante de cumplir con las disposiciones legales que han sido citadas precedentemente, para actuar en procesos judiciales con la suficiente personería. En todo caso, el recurrente no acreditó que el instrumento público que –señala- fue otorgado en el extranjero, cumpla las formas allí establecidas, conforme establece el art. 1294 del Código Civil.

Conforme a lo expuesto, por carecer de la formalidad legal observada, el testimonio de poder N° 493/2003, de fecha 11 de  noviembre de 2003, otorgado por la Notaría de Fe Pública N° 61 de la ciudad de la Paz, Dra. Tatiana Terán de Velasco, es insuficiente para acreditar la personería de Primitivo Gutierrez Sanchez, en representación de FORD MOTOR COMPANY.

Por otro lado, siempre con relación a la personería jurídica del recurrente, el testimonio de poder que acompañó, le otorga facultades para intervenir: "...en defensa de la empresa dentro del proceso civil ordinario iniciado por AUTOMOTORES GALINDO S.A. y actualmente radicado en el Juzgado Séptimo de Partido en lo Civil del Distrito de Cochabamba-República de Bolivia..."; pero no le confiere poder expreso para actuar en el presente recurso de amparo constitucional y dirigir la acción contra el Juez Séptimo de Partido en lo civil o las Vocales de la Sala Civil Segunda de la Corte de Justicia de Cochabamba.

Al respecto, el art. 809 del Código Civil establece: "El mandato es especial para uno o muchos negocios determinados; o general para todos los negocios del mandante". El poder especial se otorga a alguien para actos determinados y solamente para ellos. Para actuar en procesos judiciales se requiere poder especial, conforme prescribe el art. 835 del Código Civil, parágrafo I: "El poder general no confiere facultades para los actos judiciales que por su naturaleza exijan poderes especiales o la presencia personal del interesado".

En el caso, el poder conferido por FORD MOTOR COMPANY se otorgó para actuar dentro del proceso ordinario iniciado por Galindo S.A., pero no para actuar en este recurso de amparo constitucional seguido contra las autoridades judiciales del Juzgado de Partido Séptimo en lo Civil de la Capital y Sala Civil Segunda; es decir, ese mandato no es especial para que el recurrente actúe en esta acción, porque carece de atribución específica en ese sentido. Esto quiere decir que el testimonio presentado por el recurrente es insuficiente para acreditar su personería.

II. El testimonio de poder que utiliza el recurrente para actuar en esta acción, tampoco cumple la disposición del art. 402 del Código de Procedimiento Civil, porque no ha sido presentado en su integridad, en idioma español, contiene aún partes en idioma extranjero que se encuentran sin traducir. Esta situación

2

3

invalida el valor probatorio procesal de ese instrumento, y refuerza la conclusión de que el recurrente no ha acreditado debidamente su personería.

III. El Tribunal Constitucional ha establecido que la tutela solicitada debe ser expresa, clara y precisa, conforme el requisito de contenido previsto en el art. 97, parágrafo VI de la Ley del Tribunal Constitucional, que exige precisar el amparo que se solicita, vinculado al objeto del recurso o causa petendi, a objeto de que la Resolución que emita el órgano jurisdiccional que conoce y define el recurso guarde congruencia con lo que se pide (petitium del recurso). Este entendimiento se encuentra reflejado en la Sentencia Constitucional Nº 0365/2005-R, de 13 de abril de 2005, que señala:"(...) Por principio general, el Juez de tutela está obligado a conceder solamente lo que se le ha pedido; esto muestra la enorme importancia que tiene el petitium de la causa, pues, el Juez está vinculado a la misma; esto es, deberá acceder o negar el petitorio formulado; sólo excepcionalmente, dada la naturaleza de los derechos protegidos es posible que el Juez constitucional pueda conceder una tutela ultra petita, de cara a dar efectividad e inmediatez a la protección del derecho o la garantía vulnerada, cuando advierta que existió error a tiempo de formular el petitorio. Extremo que deberá ser ponderado en cada caso concreto, al tratarse de una excepción (...)".

En el caso, el recurrente no fija con precisión el amparo que solicita, porque en su petitum no expresa que se deje sin efecto el auto pronunciado por el Juez Séptimo de Partido en lo Civil, de fecha 29 de marzo de 2004; sin embargo, solicita que el nombrado Juez declare probada la excepción de arbitraje que opuso en representación de Ford Motor Company; lo que significa que estando vigente la primera resolución habría que aceptar que se dicte otra paralela en sentido contrario; situación que resulta incongruente y contraria a todo orden jurídico. Por este motivo, se establece que el recurrente incumplió la previsión del art. 97, parágrafo VI de la Ley del Tribunal Constitucional, cuyos alcances están expresados en el entendimiento jurisprudencial citado en el párrafo precedente.

IV.- Con relación a la improcedencia del amparo por cuestión de subsidiariedad, el Tribunal Constitucional, mediante Sentencia Nº 808/2006, de fecha 17 de agosto de 2006, establece "Que, el carácter subsidiario del recurso de amparo, ha sido desarrollado por abundante jurisprudencia de este Tribunal, así tenemos las SSCC 1089/2003-R, 0552/2003-R, 0106/2003-R, 0374/2002-R, entre otras, que señalan que no podrá ser interpuesta esta acción extraordinaria, mientras no se haya hecho uso de los recursos ordinarios o administrativos y, en caso de haber utilizado los mismos deberán ser agotados dentro de ese proceso o vía legal, sea judicial o administrativa, salvo que la restricción o supresión de los derechos y garantías constitucionales ocasione perjuicio irremediable e irreparable.

Que, de ese entendimiento jurisprudencial, se extraen las siguientes reglas y subreglas de improcedencia de amparo por subsidiariedad cuando: 1) las autoridades judiciales o administrativas no han tenido la posibilidad de pronunciarse sobre un asunto porque la parte no ha utilizado un medio de defensa ni ha planteado recurso alguno, así: a) cuando en su oportunidad y en plazo legal no se planteó un recurso o medio de impugnación y b) cuando no se utilizó un medio de defensa previsto en el ordenamiento jurídico; y 2) las autoridades judiciales o administrativas pudieron haber tenido o tienen la posibilidad de pronunciarse, porque la parte utilizó recursos y medios de defensa, así: a) cuando se planteó el recurso pero de manera incorrecta, que se daría en casos de

3

4

planteamientos extemporáneos o equivocados y b) cuando se utilizó un medio de defensa útil y procedente para la defensa de un derecho, pero en su trámite el mismo no se agotó, estando al momento de la interposición y tramitación del amparo, pendiente de resolución. Ambos casos, se excluyen de la excepción al principio de subsidiariedad, que se da cuando la restricción o supresión de los derechos y garantías constitucionales denunciados, ocasionen perjuicio irremediable e irreparable, en cuya situación y de manera excepcional, procede la tutela demandada, aún existan otros medios de defensa y recursos pendientes de resolución".

En el caso, aunque el recurrente interpuso en el juicio ordinario civil que se tramita ante el Juzgado 7° de Partido en lo Civil de la Capital, recurso de apelación contra la resolución de la autoridad judicial de ese Juzgado, de fecha 29 de marzo de 2004, en forma errada, porque ese resolución resultaba inimpugnable por disposición del art. 12, parágrafo III de la Ley de Arbitraje y Conciliación; mientras el recurso estuvo pendiente de resolución, suspendió el plazo de 6 meses y el recurrente conservó el derecho de accionar por vía del recurso de amparo constitucional a partir de la notificación con el auto de vista de fecha 26 de mayo de 2006, resolución que se le notificó en fecha 9 de junio de 2006 (conforme se evidencia de la diligencia que corre a fs. 194 vlta. del proceso ordinario principal).

El Tribunal Constitucional ha establecido mediante Sentencia Constitucional N° 770/2003, de 6 de junio de 2003, que el plazo máximo dentro del cual se debe accionar la tutela de este recurso es de seis meses, término que se computa a partir del último reclamo que se efectúa respecto de los actos que lesionan o vulneran los derechos y garantías constitucionales. En el caso, el plazo corrió a partir de la notificación con el auto de vista de 26 de mayo de 2006 al recurrente, que se produjo en fecha 9 de junio de 2006 (fs. 194 vlta. del expediente principal) y feneció en fecha 9 de diciembre de 2006, fecha en que precisamente el recurrente interpuso el presente recurso de amparo constitucional, impidiendo la prescripción de su derecho de accionar por el transcurso del tiempo.

En consecuencia, aunque el principio de subsidiariedad no es aplicable al caso, la situación planteada no se encuentra dentro de los alcances y previsiones del art. 19 de la Constitución Política del Estado y no cumple los requisitos del art. 97, parágrafos I y VI de la Ley del Tribunal Constitucional, de manera que corresponde declarar la improcedencia del recurso de amparo presentado por Primitivo Gutierrez Sánchez.

**POR TANTO:** La Sala Penal Tercera de la Corte Superior de Justicia de este Distrito Judicial, declara IMPROCEDENTE el amparo solicitado por Primitivo Gutierrez Sanchez, de fecha 09 de diciembre de 2006.

Conforme la previsión del artículo 102-V de la Ley 1836, elévese en revisión la presente resolución ante el Tribunal Constitucional en el plazo de 24 horas.- Regístrese.

Vocal relator: Dr. Juan Marcos Terrazas Rojas.
Fdo. Dr. Ángel Villarroel Diaz y Dr. Juan Marcos Terrazas, Presidente y Vocal de la Sala Penal Tercera. Ante mi Secretaria. Doy fe.
Es Conforme

Mirtha G. Meneses Gómez
SECRETARIA DE CÁMARA
DE LA SALA PENAL PRIMERA
CORTE SUPERIOR DE JUSTICIA
Cochabamba - Bolivia

4

EXHIBIT J



SENTENCIA CONSTITUCIONAL 0583/2010-R
Sucre, 12 de Julio de 2010

Expediente: 2007-15412-31-RAC
Distrito: Cochabamba
Magistrado Relator: Dr. Juan Lanchipa Ponce

En revisión la Resolución de 2 de febrero de 2007, cursante de fs. 89 a 90 vta., pronunciada por la Sala Penal Tercera de la Corte Superior del Distrito Judicial de Cochabamba dentro del recurso de amparo constitucional, ahora acción de amparo constitucional interpuesto por Primitivo Gutiérrez Sánchez en representación de Ford Motor Company contra Virginia Rocabado Ayaviri, Maria del Carmen Ponce de Rocha, Vocales de la Sala Civil Segunda de la Corte Superior de Justicia; y, Basilio Cruz Chilo, Juez Séptimo de Partido en lo Civil y Comercial todos del mismo Distrito Judicial, alegando la vulneración de los derechos de la empresa que representa a la seguridad jurídica y a la defensa, citando al efecto los arts. 7 inc. a) y 16.II de la Constitución Política del Estado abrogada (CPEabrg).

I. ANTECEDENTES CON RELEVANCIA JURÍDICA

I.1. Contenido del recurso

I.1.1. Hechos que motivan el recurso

El recurrente en el memorial presentado el 9 de diciembre de 2006, cursante de fs. 27 a 31, manifiesta que el 2 de agosto de 2002, la Sociedad Galindo S.A., interpuso demanda ordinaria por resarcimiento de daños y prejuicios contra la empresa que representa, la que a su vez el 14 de noviembre de 2003, interpuso excepción de arbitraje, que fue desestimada por el Juez ad-quo (sic) por Resolución de 29 de marzo de 2004; contra la que se interpuso recurso de apelación, habiendo la Sala Civil Segunda del Distrito Judicial de Cochabamba, dictado Auto de Vista de 26 de mayo de 2006, anulando el Auto de concesión del recurso de apelación y declarando ejecutoriada la Resolución que desestima la excepción de arbitraje; señalando el inferior que al haber la compañía Ford, terminado unilateralmente el contrato, resulta imposible llevar el reclamo a la vía arbitral en aplicación del art. 12.III de la Ley 1770 de 10 de marzo de 1997, sin tomar en cuenta lo previsto por el art. 11 de la misma Ley sobre la autonomía del convenio arbitral, haciendo referencia al contrato de 1999, denominado Convenio de Ventas y Servicios del Concesionario Importador Global, que establece que a la terminación del contrato y de cualquiera o todos sus anexos se pondrá en marcha el siguiente procedimiento que constituirá un recurso exclusivo para las partes y corresponderá el arbitraje, por lo que la terminación unilateral del contrato no afecta de modo alguno la cláusula arbitral y tampoco implica un acto de imposible de ejecución.

I.1.2. Derechos supuestamente vulnerados

El recurrente estima vulnerados los derechos de la empresa que representa a la seguridad jurídica y a la defensa citando al efecto los arts. 7 inc. a) y 16.II de la CPEabrg.

I.1.3. Autoridades judiciales recurridas y petitorio

Con esos antecedentes interpone recurso de amparo constitucional contra Virginia Rocabado Ayaviri y María del Carmen Ponce de Rocha, Vocales de la Sala Civil Segunda de la Corte Superior; y Basilio Cruz Chilo, Juez Séptimo de Partido en lo Civil y Comercial todos del Distrito Judicial de La Paz, solicitando se declare procedente el recurso y deje sin efecto la declaración de ejecutoria del Auto de 29 de marzo de 2004 y el ad-quo (sic) cumpla el art. 12.III de la Ley 1770, declarando probada la excepción de arbitraje, remitiendo obrados a la autoridad competente.

I.2. Audiencia y resolución del Tribunal de garantías

Efectuada la audiencia publica el 2 de febrero de 2007, conforme consta del acta que cursa de fs. 85 a 88 vlta., con la presencia del recurrente y el tercero interesado y en ausencia de las autoridades recurridas, como el representante del Ministerio Público se produjeron los siguientes actuados:

I.2.1. Ratificación y ampliación del recurso

El recurrente ratifico los términos del recuso planteado y ampliando; señalo que la compañía y el concesionario deben someterse a un periodo de reuniones y si dentro de treinta días no se llega a una conciliación, corresponde acudir al arbitraje ante la autoridad competente que es la Asociación Americana de Arbitraje, por cuando el contrato fue firmado en Estados Unidos, en cuya instancia las partes nombran en forma conjunta un árbitro y si no lo hacen la comisión procede con el correspondiente nombramiento.

I.2.2. Informe de las autoridades recurridas

Las Vocales recurridas, en el informe escrito cursante de fs. 70 a 71, señalaron; 1) El poder acompañado al recurso es insuficiente, pues la fotocopia no está legalizada con el sello de la Fundacion para el Desarrollo Empresarial (FUNDEMPRESA), por lo que no debió ser admitido; y, 2) Ratifican íntegramente lo resuelto en el Auto de Vista de 26 de mayo de 2006, ya que en ningún momento violaron el derecho a la seguridad jurídica, ni a la defensa ya que de lo único que se acusa en el recurso, es haber declarado ejecutoriado el Auto apelado, decisión que se enmarca a las disposiciones procedimentales y al principio de preclusión.

El Juez correcurrido, presento informe escrito, cursante de fs. 72 a 74, en el que indica: a) Galindo S.A. el 2 de agosto de 2002 dedujo proceso ordinario contra Ford Motor Company por resarcimiento de daños y perjuicios, la que citada opuso excepción de arbitraje; b) La que por Auto de 29 de marzo de 2004, desestimó la excepción porque el convenio arbitral esta legislado por el art. 10 y la excepción por el art. 12 ambos, de la Ley 1770, pues la compañía decidió terminar con la vigencia del contrato por decisión unilateral, y sobre los daños reclamados por el concesionario, resulta imposible llevar a la vía arbitral, conforme señala el art. 12.III de la citada Ley, además la Resolución fue pronunciada en aplicación de los arts. 519 y 520 del Código Civil (CC), aplicable supletoriamente por disposición del art. 97 de la Ley 1770; y, c) La ley nacional rige para todos los habitantes, sean nacionales o extranjeros domiciliados, o transeúntes, bajo el principio de territorialidad señalado en los arts. 2, 228 y 229 de la CPEabrg.

I.2.3. Intervención del tercero interesado

Enrique Galindo Huerta, por Galindo S.A. en el memorial cursante de de fs. 75 a 77, indica que la Resolución que desestima la excepción de arbitraje, no admite recurso ulterior y que

desde la notificación a la empresa transcurrieron dos años y nueve meses, cuando el amparo debe ser presentado dentro de los seis meses, por lo que debió ser rechazado in limine. El apoderado no tiene legitimación activa porque no cumplió lo dispuesto en los arts. 809, 811 y 835 del CC y 97.1 de la Ley 1836 de 1 e abril de1998.

I.2.4. Resolución

La Sala Penal Tercera de la Corte Superior del Distrito Judicial de Cochabamba, constituida en Tribunal de Garantías, dictó Resolución de 2 de febrero de 2007, declarando improcedente el recurso, con los siguientes fundamentos: i) La demanda de amparo no cumple los requisitos establecidos por el art. 94 de la Ley del Tribunal Constitucional (LTC), porque no se acreditó de manera suficiente la personería del demandante, concordante con los arts. 809 y 835 del CC, asimismo no se dio cumplimiento al art. 402 del Código de Procedimiento Civil (CPC); ii) La Compañía demandante no adecuo el amparo conforme prescriben los arts. 5, 27, 29, 33 y 165 del Código de Comercio (Ccom), por cuanto no acompaña su matricula de registro de comercio que acredite a su representante legal; iii) El amparo no se encuentra dentro los alcances y previsiones del art. 19 de la CPEabrg y no cumple los requisitos del art. 97 I. y VI de la LTC; y iv) Que además el recurso ha sido interpuesto extemporáneamente, toda vez que el Auto de Vista impugnado ha sido notificado el 9 de junio de 2006, y esta acción tutelar fue presentada el 9 de diciembre del mismo año.

I.3. Trámite procesal en el Tribunal Constitucional

Por Acuerdo Jurisdiccional 001/2010 de 8 de marzo, se señaló el reinicio de las labores jurisdiccionales, a cuya consecuencia se procedió al sorteo de la presente causa el 18 de mayo de 2010, por lo que la Sentencia Constitucional es pronunciada dentro de plazo.

II. CONCLUSIONES

De la atenta revisión y compulsa de los antecedentes que cursan en obrados se establece lo siguiente:

II.1.El 2 de agosto de 2002, Galindo S.A. interpuso juicio ordinario contra Ford Motor Company, sobre resarcimiento de daños y perjuicios radicado en el Juzgado Séptimo de Partido en lo Civil y Comercial del Distrito Judicial de Cochabamba a cargo del Juez recurrido (fs. 34 a 37 vta.).

II.2. En el memorial presentado el 24 de noviembre de 2003, la representante de Ford Motor Comapany interpuso excepción de arbitraje (fs. 38 a 40), la que fue desestimada por el Juez recurrido por Auto de 29 de agosto de 2004, con el fundamento que la nombrada Compañía terminó con la vigencia del contrato por decisión unilateral, por lo que resulta imposible llevar ese reclamo sobre los daños ocasionados a la vía arbitral ante un tribunal arbitral de Michigan Estados Unidos de Norte América, en observancia del art. 12.III de la Ley 1770 (fs. 41 y vta.).

II.3.Apelada la anterior determinación (fs. 45 a 47), la Sala Civil Segunda a cargo de las Vocales co-recurridas por Auto de Vista de 26 de mayo de 2006, anuló el Auto de concesión de alzada de 24 de mayo 2004, con el argumento de que el art. 12.III de la Ley 1770 señala que la desestimación de la excepción de arbitraje no admite recurso alguno, y en consecuencia, declaró ejecutoriada la Resolución de 29 de marzo de 2004 (fs. 48 y vta.), que fue notificada a la empresa representada por el recurrente el 9 de junio de 2006 (fs. 48 vta.).

III. FUNDAMENTOS JURÍDICOS DEL FALLO

El recurrente, ahora accionante denuncia la vulneración de los derechos de la empresa que representa, a la seguridad jurídica y a la defensa, aduciendo que dentro del proceso ordinario que se sigue contra su representada, ésta interpuso excepción de arbitraje, que fue desestimada por el Juez recurrido, por lo que interpuso recurso de apelación, habiendo las vocales co-recurridas, dictado Auto de Vista por el que anularon el Auto de concesión de la alzada y declararon la ejecutoria de la Resolución que desestima la excepción planteada. Por consiguiente, en revisión de la Resolución de amparo constitucional, corresponde determinar si se debe otorgar o no la tutela solicitada.

III.1.Consideraciones previas. Aplicación de la Constitución Política del Estado y uso de terminología adecuada en la acción de amparo constitucional

De conformidad a lo establecido en el art. 410 de la Constitución Política del Estado vigente (CPE), al ser la Constitución la norma suprema del ordenamiento jurídico boliviano y gozar de primacía frente a cualquier otra disposición normativa, a objeto de cumplir el mandato y las funciones establecidas por los arts. 1 y 7 de la LTC, 4 de la Ley 003, Ley de Necesidad de Transición a los Nuevos Entes del Órgano Judicial y Ministerio Público, mediante la SC 0011/2010-R de 6 de abril, éste Tribunal determinó que toda su actuación será acorde al nuevo orden constitucional en observancia y coherencia con los Tratados y Convenios Internacionales en materia de Derechos Humanos ratificados por el país y que forman parte del bloque de constitucionalidad.

Asimismo, en el orden procesal en lo atinente a la terminología de esta acción tutelar, luego de un análisis normativo a través de la SC 0071/2010-R de 3 de mayo, se unificó criterios y se estableció que para referirse a la persona física o jurídica que interponga esta acción tutelar será 'accionante', y con relación a la autoridad, funcionario, o persona contra quien se dirige esta acción corresponderá el término 'demandado (a)'. De igual manera, en cuanto a la terminología con referencia a la parte dispositiva, en caso de otorgar la tutela se utilizará el término 'conceder' y en caso contraria 'denegar' la tutela.

En los casos en que no sea posible ingresar al análisis de fondo de la problemática planteada, se mantendrá la denegatoria, haciéndose constar tal situación, dado que el accionante puede nuevamente interponer la acción tutelar, siempre y cuando, cumpla con los requisitos de admisibilidad.

Resoluciones que en virtud a los arts. 4 y 44 de la LTC, son de carácter vinculante para todas las autoridades judiciales que actúen como tribunal de garantías constitucionales, como para este Tribunal. (SC 0119/2010-R de 10 de mayo).

III.2.Legitimación activa en la acción de amparo constitucional, en los casos de representación con mandato de personas jurídicas

III.2.1.Marco constitucional, legal y jurisprudencial

El art. 19.II de la CPEabrg, establecía que El recurso de amparo se interpondrá por la persona que se creyere agraviada o por otra a su nombre con poder suficiente... El art. 129.I de la CPE, establece que: la acción de amparo constitucional se interpondrá por la persona que se crea afectada, por otra a su nombre con poder suficiente Por su parte, el art. 97 de la LTC, señala los requisitos de forma y contenido a observar para la presentación del amparo constitucional, prescribiendo en su parágrafo I: Acreditar la personería del recurrente. Asimismo, el art. 98 de la citada Ley prevé: El Tribunal o Juez competente en el plazo de veinticuatro horas admitirá el recurso de amparo constitucional que cumpla con los requisitos de forma y contenido exigidos por el artículo precedente; caso contrario será rechazado. Los

defectos formales podrá subsanar el recurrente en el plazo de cuarenta y ocho horas de su notificación sin ulterior recurso.

Al respecto la jurisprudencia constitucional estableció que: los requisitos formales son los previstos en los parágrafos I, II y V del art. 97 de la LTC, los que podrán ser subsanados por el recurrente en el plazo mencionado (SC 0245/2004-R de 20 de febrero, entre otras); empero, en los casos en que se omita observar el incumplimiento de un requisito de forma y pese a ello se admita el recurso, este defecto dará lugar a que se declare su improcedencia. Así, las SSCC 0038/2005-R; 1730/2004 y 1144/2003-R.

La observancia del cumplimiento de los requisitos tanto de forma como de contenido para la admisión del recurso, ahora acción de amparo constitucional, se sustentan en que de su cumplimiento depende que tanto el juez o tribunal de amparo así como el Tribunal Constitucional, puedan compulsar sobre la base de criterios objetivos, la legitimación de las partes, así como la veracidad de los hechos reclamados y los derechos lesionados, para en definitiva otorgar o negar el amparo expresamente solicitado; a su vez tiende a garantizar también que con tales precisiones puedan estar a derecho las partes para asumir defensa en debida forma (SC 0365/2005-R de 13 de abril).

Ahora bien, sobre el requisito de forma relacionado con la personería del recurrente, hoy accionante, conforme a los preceptos constitucionales y legales anteriormente citados, éste puede actuar por sí o mediante representación a través de poder suficiente, lo que resulta usual tratándose de personas jurídicas o colectivas. Sobre el particular, la jurisprudencia del Tribunal Constitucional se ha pronunciado en reiteradas oportunidades haciendo hincapié en los requisitos que se deben cumplir a los efectos de que el poder notarial que se acompaña al recurso sea considerado suficiente a los efectos de la admisión a trámite de un amparo constitucional promovido por personas jurídicas. Así, este Tribunal en la SC 0171/2005-R de 28 de febrero, ha señalado:

...la SC 0022/2003-R, de 8 de enero, ha dejado sentado lo siguiente: 'En el caso de las personas jurídicas, como es la sociedad agrícola ganadera () el recurrente, que es quien demanda en su representación, debió acreditar su condición de legítimo representante adjuntando el poder correspondiente, en el que debía constar inexcusablemente el acta de constitución de la sociedad, la nómina de socios, su inscripción al registro de Comercio, su personería jurídica y sus Reglamentos.()'. Por su parte, en la SC 1823/2003-R, de 5 de diciembre que compulsaba una problemática relacionada con un recurso de amparo presentado a nombre de una empresa argentina, se señaló: '() el Poder Especial presentado por el recurrente y que cursa de fs. 1 a 3, acredita que () en su condición de representante legal de la () le faculta a interponer el presente amparo constitucional; sin embargo, en el mismo documento no consta la escritura de constitución de la referida sociedad comercial, sus estatutos, la resolución que le confiere personalidad jurídica, su inscripción al registro correspondiente más aún tratándose de una entidad constituida en el extranjero, en el referido Poder tampoco consta que se encuentra legalmente establecida en Bolivia. Consiguientemente, se determina que el recurrente carece de legitimación activa para interponer el recurso al no haber acreditado debidamente su personería, omisión que determina la improcedencia del recurso e impide conocer el fondo de asunto y que debió ser observada por el Tribunal de amparo a tiempo de considerar la presentación del recurso, en estricto cumplimiento de lo dispuesto por el art. 19.II CPE y 97.I LTC.' Este mismo criterio fue asumido en la SC 0994/2004-R, de 29 de junio, relacionada con un poder otorgado en la República de México.

La misma Sentencia resolviendo el caso concreto, mismo que contiene situaciones fácticas similares al asunto que ahora se analiza en relación al poder presentado en el recurso que le toco resolver, hizo énfasis en lo siguiente: Dicha línea jurisprudencial corresponde ser

aplicada a la problemática que se analiza, en vista de que el Poder otorgado por Diego Canelos Velasco, en representación de Seatech International Inc. a favor del recurrente, ante Notaría de la ciudad de Cartagena de Indias-Colombia, protocolizado por orden judicial en la Notaría de Fe Pública 054 de La Paz-Bolivia, no cumple los requisitos precedentemente señalados, puesto que no consta en el mismo el acta de constitución de la indicada sociedad comercial, la acreditación de su personalidad jurídica, estatuto, reglamento, nómina de sus socios y menos que se encuentra legalmente establecida en Bolivia, exigencias que deben cumplirse a los efectos de establecer con certeza la existencia legal de la persona jurídica que demanda, presupuesto indispensable -tratándose de este tipo de personas- para que ella pueda ser considerada titular de derechos e invocar la vulneración a los mismos, siendo además que de acuerdo a lo referido por el propio actor, se trata de una sociedad constituida y con domicilio legal en el extranjero, que no ejerce actos de comercio en Bolivia, no habiéndose demostrado por tanto el reconocimiento de su capacidad jurídica por parte del Estado Boliviano, por lo que no se encuentra legitimada activamente para interponer el presente recurso, condición que es esencial para la admisión del amparo. Consecuentemente, no habiendo el actor acreditado debidamente su personería, el recurso debe ser declarado improcedente, no pudiéndose ingresar al análisis de fondo del asunto, aspecto que el Tribunal de amparo debió tomar en cuenta a tiempo de admitir la demanda, en observancia de lo establecido por los arts. 19.II de la CPE y 97.I de la LTC

Consecuentemente, la noción sobre lo que debe entenderse por poder suficiente al que hacen referencia los arts. 19.II de la CPEabrg y 129.I de la CPE, conforme a la jurisprudencia precedentemente glosada, pasa por la observancia de requisitos imprescindibles que debe contener el poder para demostrar la representación de una persona física que pretenda actuar a nombre de una persona jurídica, como son el acta de constitución de la sociedad, la acreditación de su personalidad jurídica, la nómina de socios, su inscripción en el Registro correspondiente, Estatutos y Reglamentos; jurisprudencia que por lo demás ha sido reiterada en varios fallos, entre los que podemos citar las SSCC 0858/2005-R, 1121/2006-R, 0773/2007-R y más recientemente la SC 0137/2010-R de 17 de mayo, jurisprudencia que tiene carácter vinculante a tenor de lo establecido por el art. 44.I de la LTC, por lo que resulta obligatoria no sólo para los organos del Estado, legisladores y autoridades, sino también para este Tribunal.

III.2.2 Análisis del caso concreto

La jurisprudencia precedentemente glosada es de aplicación al caso que se revisa, por cuanto de la revisión del poder de representación acompañado por el recurrente, ahora accionante (fs. 17 a 25, y su original de fs. 93 a 101) se evidencia que si bien Ford Motor Company le faculta a actuar en defensa de la empresa dentro del proceso civil que ha motivado el entonces recurso, hoy acción, pudiendo al efecto interponer recursos ordinarios y extraordinarios incluyendo los recursos constitucionales establecido en la Ley del Tribunal Constitucional (sic); no cursa en dicho instrumento mínimamente la transcripción de los documentos relativos a la constitución de la compañía, la acreditación de su personalidad jurídica, documentos relativos a la legal conformación de su directorio, miembros que la integran, elección de su representante legal, normas que autoricen delegar facultades, etc; por el contrario, se establece más bien la otorgación de facultades por una Secretaria Suplente y que otro Secretario también suplente, certifica que la primera es precisamente Secretaria Suplente y que a ella le delegaron facultades a su vez delegadas por el Presidente del Directorio, por lo que el aludido poder no puede ser considerado suficiente, habiéndose inobservando en consecuencia un requisito formal, en tal virtud el Tribunal de amparo debió rechazar el recurso, pero dado que fue admitido hasta dictarse la Resolución que se revisa, corresponde denegar la tutela solicitada sin ingresar al análisis de fondo de la problemática planteada.

III.3. El principio de subsidiariedad y de inmediatez en la interposición de la acción de amparo constitucional

El recurso de amparo constitucional, actualmente acción de amparo constitucional, instituido por el art. 128 de la CPE, contra los actos u omisiones ilegales o indebidos de los servidores públicos, o de persona individual o colectiva, que restrinjan, supriman, o amenacen restringir o suprimir los derechos reconocidos por la Constitución y la ley; constituye un medio de tutela de carácter extraordinario, que está regido por los principios de subsidiariedad e inmediatez en la interposición de la tutela.

III.3.1. En cuanto a la idoneidad de los medios y recursos tendientes a reparar el daño o lesión de derechos

En cuanto al agotamiento de los medios o recursos legales sean en la vía judicial o administrativa antes de interponer la acción de amparo constitucional, la jurisprudencia constitucional ha establecido que los mismos deben ser los idóneos y efectivos; vale decir, aquellos que se encuentran establecidos por ley para cada situación o caso en particular, no siendo coherente acudir a un medio o recurso legal que se sabe de antemano resultará inviable, pues especialmente tratándose de decisiones judiciales, los procedimientos que rigen las diferentes materias establecen con precisión los recursos que corresponden a determinada resolución judicial, por lo que el titular del derecho no puede extraviarse acudiendo o utilizando medios o recursos que no son aptos para enervar el acto que estima lesivo, sino que más bien debe buscar una protección inmediata por vía del amparo una vez agotados los medios adecuados en la vía ordinaria.

Al respecto, la SC 0770/2003-R, señaló que: el principio de subsidiariedad no implica la utilización de cualquier medio o recurso sino los idóneos, empero la utilización de otros que no sean los adecuados para hacer cesar el acto ilegal u omisión indebida que se reclama no neutraliza la protección de amparo, siempre que se hubiesen utilizado los requeridos por ley, lo que no sucede cuando ocurre lo contrario, pues la falta de utilización de los medios idóneos anula toda posibilidad de ingresar al fondo de la problemática sino también de otorgar la tutela.

III.3.2 En cuanto al plazo de los seis meses o inmediatez en la solicitud de tutela

El principio de inmediatez, entendido no sólo como la tutela inmediata, sino también como el requisito de solicitar la misma en forma pronta, oportuna y sin dilaciones innecesarias, es decir, una vez que se opere la vulneración del derecho y se agoten las vías legales ordinarias; en otras palabras, es el plazo para la interposición de esta acción tutelar, que actualmente se encuentra previsto en el art. 129.II de la CPE, que señala: La Acción de Amparo Constitucional podrá interponerse en el plazo máximo de seis meses, computable a partir de la comisión de la vulneración alegada o de notificada la última decisión administrativa o judicial.

Este plazo de caducidad, encuentra sentido cuando se tiene en cuenta que la jurisdicción constitucional no puede aguardar de manera indefinida a que el titular del derecho solicite su protección, pues en su propio interés debe ser diligente en cuanto al respeto y vigencia de sus derechos que sufren menoscabo, por ello tiene el derecho y el deber de acudir sin ningún tipo de espera o dilación en busca de la protección requerida. Al respecto, la ya citada SC 0770/2003-R, señaló que: ...resulta lógico, puesto que responde no sólo al principio de inmediatez sino también a los principios de preclusión y celeridad, los mismos que no sólo dependen de los actos de la autoridad sino también del peticionante, quien debe estar compelido por su propio interés a realizar el seguimiento que corresponda a su solicitud, de modo que cuando no ha sido diligente en propia causa no se puede pretender que esta

jurisdicción esté supeditada en forma indefinida para otorgarle protección.

III.3.3 En cuanto al momento o inicio de dicho cómputo

Como señala la norma constitucional citada, art. 129.II de la CPE, es a partir de la comisión de la vulneración alegada o de notificada la última decisión administrativa o judicial, que se considera lesiva y que es inimpugnable, y por tanto agota la vía respectiva; o desde la notificación con la resolución emergente de un recurso o medio impugnativo que el agraviado y accionante hubiese utilizado para la protección de sus derechos lesionados. No obstante en un plano de equilibrio y coherencia con el principio de subsidiariedad, para dicho cómputo debe tenerse en cuenta que ese acto o medio impugnativo utilizado en la vía reparadora, y previa a la acción de amparo, debe ser idóneo, es decir, previsto por ley, y que tenga la posibilidad de cambiar el fondo de lo que se acusa de ilegal o lesivo de derechos; estando exento de dicho cómputo aquellos medios y recursos no previstos por ley o presentados erróneamente, toda vez que la finalidad de esta acción tutelar no es reparar errores del agraviado o accionante, sino, derechos fundamentales.

En ese sentido, este Tribunal ya generó un razonamiento, como el caso de la SC 0079/2007-R de 23 de febrero, que al respecto estableció que: cuando se reclama ante instancias no competentes o por medios no idóneos, éstos no pueden interrumpir el plazo de seis meses de caducidad del recurso de amparo, ya que al no ser mecanismos legales, no pueden generar una consecuencia jurídica habilitante para impedir la prescripción del derecho a acceder a dicho recurso; en tal sentido, sólo las vías legales e idóneas interrumpen el plazo de seis meses determinado como máximo para acceder al recurso de amparo constitucional, criterio seguido en las SSCC 0252/2007-R, 0646/2007-R y 0687/2007-R.

A mayor abundamiento, cabe señalar que cuando se impugnan resoluciones judiciales o administrativas a través de esta acción tutelar, a partir del entendimiento sentado en las SC 521/2010-R, de 5 de julio, si la resolución ha sido aclarada, enmendada o complementada, sólo en ese caso el plazo se computa desde la notificación de la resolución que dio lugar a dicha solicitud.

A mayor abundamiento cabe señalar que cuando se impugnan resoluciones judiciales o administrativas a travez de esta acción tutelar a partir del entendimiento sentado en la SC 0512/2010-R de 5 de julio, si la Resolución ha sido aclarada, emanada o complementada, solo en ese caso se computa desde la notificación que dio lugar a dicha solicitud.

III.3.4 Análisis del caso
El fondo de la problemática denunciada por el accionante es que la empresa que indica representar, dentro de un proceso ordinario que se sigue en su contra en la justicia ordinaria civil, interpuso excepción de arbitraje, que fue desestimada por el Juez demandado, resolución confirmada por el Tribunal de apelación, motivo por el cual interpone la acción de amparo constitucional que hoy se revisa.

No obstante, de la revisión de los datos del expediente se constata que la resolución que rechazó la excepción de arbitraje pronunciada por Basilio Cruz Chilo, Juez Séptimo de Partido en lo Civil Comercial del Distrito Judicial de Comercial del Distrito Judicial de Cochabamba, es de 29 de marzo de 2004; al respecto es preciso señalar que el art. 12 de la Ley de Arbitraje y Conciliación (LAC), regula lo relacionado a la Excepción de arbitraje, y establece que:

I. El convenio arbitral importa la renuncia de las partes a iniciar proceso judicial sobre las materias o controversias sometidas al arbitraje. II. La autoridad judicial que tome conocimiento de una controversia sujeta a convenio arbitral debe inhibirse de conocer el caso

cuando lo solicite la parte judicialmente demandada. En este caso, dicha parte puede oponer excepción de arbitraje en forma documentada y antes de la contestación. La excepción será resuelta sin mayor trámite, mediante resolución expresa. III.Constatada la existencia del convenio arbitral y sin lugar a recurso alguno, la autoridad judicial competente declarará probada la excepción de arbitraje o, pronunciándose únicamente sobre la nulidad o ejecución imposible del convenio arbitral desestimará la excepción de arbitraje. IV.No obstante haberse entablado acción judicial, se podrá iniciar o proseguir las actuaciones arbitrales y dictar laudo mientras la excepción esté en trámite ante el juez.

Precisamente, por ello es que Virginia Rocabado Ayaviri, María del Carmen Ponce de Rocha, Vocales de la Sala Civil Segunda de la Corte Superior del mismo Distrito Judicial, mediante Auto de Vista de 26 de mayo de 2006, anularon la concesión de apelación por el Juez de instancia, en base a la citada previsión legal del art. 12.III de la (LAC), por cuanto su desestimación no admite recurso alguno; citando para ello, inclusive el Auto Supremo 78 de 11 de abril de 2005, que señala: cuando la autoridad judicial constata la existencia de convenio arbitral, debe declarar probada la excepción de arbitraje mediante resolución expresa que no admite recurso alguno, conforme al art. 12.III de la citada ley especial que es de aplicación preferente por mandato del art. 5 de la Ley de Organización Judicial. Que, por las razones expuestas en el caso presente, no correspondían interponerse y menos concederse los recurso tanto de apelación como de casación (fs. 16). Extremo que el propio accionante lo reconoce en su memorial de demanda al señalar que: Indudablemente, no corresponde el recurso de apelación por disposición del citado párrafo II del art. 12 de la Ley 1770 (sic) (fs. 28 vta.).

En consecuencia, sin necesidad de mayor argumentación, al estar demostrada y aceptada la inidoneidad de la apelación y por ende el Auto de Vista de 26 de mayo de 2006, su notificación no puede ser considerada para el inicio de cómputo de plazo de los seis meses, sino desde la notificación con la Resolución de 29 de marzo de 2004, que fue en el mes de abril del mismo año, y que si bien en el expediente no cursa la diligencia de dicha notificación, al cursar de fs. 9 a 11, la inidónea apelación de presentada el 12 de abril de 2004, queda por demás evidente que esta acción de amparo ha sido presentada extemporáneamente, el 9 de diciembre de 2006, tal cual consta de fs. 27 a 31. Extremo que ratifica la denegatoria de la tutela solicitada con la aclaración que no se ha ingresado al análisis de fondo de la problemática denunciada.

En consecuencia, la situación planteada no se encuentra dentro de los alcances y previsiones del amparo constitucional, por lo que el Tribunal de garantías al haber declarado improcedente al entonces recurso, ha efectuado una adecuada compulsa de los antecedentes procesales y ha dado correcta aplicación a esta acción tutelar.

POR TANTO

El Tribunal Constitucional, en virtud de la jurisdicción y competencia que le confieren los arts. 4 y 6 de la Ley 003 de 13 de diciembre de 2010, denominada Ley de Necesidad de Transición a los Nuevos Entes del Órgano Judicial y Ministerio Público; 7 inc. 8 y 102.V de la LTC, en revisión resuelve APROBAR la Resolución de 2 de febrero de 2007, cursante de fs. 89 a 90 vta., pronunciada por la Sala Penal Tercera de la Corte Superior del Distrito Judicial Cochabamba; y en consecuencia, sin ingresar al análisis de fondo de la problemática planteada, DENIEGA la tutela solicitada.

Regístrese, notifíquese y publíquese en la Gaceta Constitucional.

No interviene el Decano, Dr. Abigael Burgoa Ordóñez por excusa declarada legal.

Fdo. Dr. Juan Lanchipa Ponce
PRESIDENTE

Fdo. Dr. Ernesto Félix Mur
MAGISTRADO

Fdo. Dra. Ligia Mónica Velásquez Castaños
MAGISTRADA

Fdo. Dr. Marco Antonio Baldivieso Jinés
MAGISTRADO